**Eligh WATKINS et al., Individually and on behalf of other persons similarly situated, Plaintiffs-Appellants-Cross-Appellees,**

v.

**SCOTT PAPER COMPANY et al., Defendants-Appellees-Cross-Appellants.**

No. 74–1001.

United States Court of Appeals, Fifth Circuit.

April 29, 1976.

1162

J. U. Blacksher, Mobile, Ala., Kent Spriggs, Tallahassee, Fla., Jack Greenberg, Morris J. Baller, New York City, for Watkins and others.

Richard A. Gladstone, E.E.O.C., Washington, D. C., Amicus Curiae.

Frank McRight, Mobile, Ala., John Vanderstar, Washington, D. C., for Scott Paper Co.

Benajmin Erdreich, John C. Falkenberry, Birmingham, Ala., for United Paperworkers International Union.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

WISDOM, Circuit Judge:

This case presents, once again, the difficulties inherent in an employer's obligation to comply with Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, by undoing the effects of past racial discrimination in employment.

Five named plaintiffs brought this suit as a class action on behalf of an "affected class" of black employees at the Mobile, Alabama pulp and paper mill of Scott Paper Company (Scott).[1] The defendants are Scott, the United Paperworkers International Union (UPIU), and UPIU Locals 421, 423, 575 and 873. After a lengthy trial, the district court ruled for the defendants on almost all issues.[2] On appeal,[3] we reverse.

I. THE FACTS

Scott purchased the pulp and paper mill in 1954. As of June 1972, 3,440

---

1. The action was allowed to proceed as a class action with the class defined as all blacks employed at Scott's Mobile, Alabama facility at the commencement of this cause, all present black employees hired since that date, and all future black employees, excluding unsuccessful job applicants.

2. *See Watkins v. Scott Paper Co.,* S.D.Ala. 1973, 6 Fair Employment Practice Cases (FEPC) 511.

3. The Equal Employment Opportunity Commission, the agency established by Congress to administer, interpret, and enforce Title VII, filed a brief as *amicus curiae* in support of plaintiffs-appellants directed to the issues of the district court's failure to order complete

employees worked at the plant, which transforms wood into assorted types of paper products. The mill is organized into Production and Maintenance Departments. From the wage earners' perspective, the higher-paying, skilled craft jobs (welders, pipefitters, machinists, carpenters, sheet metal workers, brick masons, and painters) in the Maintenance Department are more desirable than the jobs in the Production Department. Within each department, jobs are functionally divided into lines of progression, or groups of related jobs in which an employee moves from lower-paying to higher-paying and more responsible jobs.

From the time the mill began operating in 1940, until 1963, job opportunities were segregated on the basis of race. Black employees were channeled into lower paying, more physically demanding jobs. For example, blacks were prohibited from working on crews that operated the paper machines, excluded from training opportunities in the Maintenance Department, and precluded from entering the line of progression that would have enabled them to advance to jobs such as "crane operator" and "woodroom yard operator". Instead, blacks were limited to such jobs as "laborer". This system of job segregation was reinforced by union policy of maintaining segregated locals. The economic impact of this discrimination was, of course, substantial. As of June 1, 1972, the average

rate of pay of affected class members was about $0.47 an hour less than the average for whites. More importantly, a comparison of average wage rates between members of the affected class and their white "contemporaries" hired between 1940 and 1954 shows that the average differential was more than $1.00 an hour.[4]

Scott does not deny that discrimination existed. It asserts, however, that it wanted to integrate its work force as early as 1955, that it then pledged to do so, probably in response to presidential executive orders.[5] Scott says that it could not do so "rapidly . . . in view of then-prevailing attitudes". In 1961 Scott announced that no job would be barred to any employee or applicant because of race. Despite this apparent compliance with its 1955 pledge, no blacks began to work in formerly all-white jobs. Only in 1963, after Scott placed four blacks into previous white jobs, did the pattern of strict segregation begin to fade. Although about one-third of the affected class members had transferred to previously all-white jobs by 1968, the majority had not.

The probable reason for the failure of more affected class members to transfer is that in 1963, when the white lines of progression in the production department were "opened" to the class, Scott imposed a high school education requirement for transfers between lines of pro-

---

injunctive relief to eliminate present discrimination and the effects of admitted past discrimination; its failure to order the elimination of the Company's tests for maintenance positions which disproportionately disadvantage blacks and are not valid under appropriate legal standards; and its failure to provide back pay to compensate the victims of such discrimination for their resulting economic losses. The Commission stated in its brief that "Resolution of these issues are of general importance to the interpretation and enforcement of Title VII".

4. The relevance of interracial wage comparisons in Title VII cases is evidenced by our discussion in *Baxter v. Savannah Sugar Ref. Corp.,* 5 Cir. 1974, 495 F.2d 437.

5. In 1951, by Executive Order 10308, President Truman established the President's Committee

on Government Contract Compliance to study and make more effective the nondiscrimination clause in government contracts. In 1953, by E.O. 10479, President Eisenhower established the President's Committee on Government Contracts which was authorized to receive complaints of violations of the clause, transmit the complaints to the contracting agencies, and oversee agency action with respect to handling complaints. *See also* E.O. No. 10925, 3 C.F.R., 1959–1963 Comp., at 448. In 1965 President Johnson's E.O. 11246 vested enforcement authority in the Secretary of Labor, *see* C.F.R., 1964–1965 Comp., at 339, who delegated such authority to the Office of Federal Contract Compliance. See the Federal Civil Rights Enforcement Effort—1974 (1975), at 230–33.

gression.[6] This requirement served to lock many affected class members into their inferior, black jobs.[7] Scott also imposed upon would-be transferors in 1963 the requirement that they achieve a passing score on the Kopas Aptitude Test. Finally, an age limit on transferors further hindered Scott's efforts to comply with its 1955 pledge to provide equal employment opportunities. The result of the various limitations upon transfer was that, by May 1969, only seven black employees hired before 1963 had transferred into formerly white lines of progression.

At that time, however, the so-called Memorandum of Understanding went into effect.[8] The negotiated Memorandum was a result of the efforts of the Department of Labor's Office of Federal Contract Compliance (OFCC) to bring Scott into line with Executive Order 11246. It provided, among other things, that affected class members could transfer into formerly white lines of progression with "[Q]ualification requirements . . . no higher for any employee than for employees working in the line who were hired at approximately the same time". The Memorandum allowed affected class members to compete within formerly white lines of progression on the basis of their mill seniority, thus seeming to comport with the Title VII remedies afforded in such cases as *Local 189, United Papermakers and Paper-*

*workers v. United States,* 5 Cir. 1969, 416 F.2d 980, *cert. denied,* 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100. The plaintiffs, however, contended that the Memorandum was inadequate in itself and, in any event, was inadequately put into effect. The specifics of this contention, with additional facts, are set forth below.

In addition to complaining about discrimination with respect to transfer opportunities within Scott's Production Department, the plaintiffs sued to enjoin the alleged discriminatory operation of Scott's system of transfers into the Maintenance Department. Scott imposed upon such transfers the high school diploma requirement and the Kopas Aptitude Test requirement in 1963, as it did for transfers within the Production Department. In 1968, Scott switched to the Wonderlic Test at the OFCC's suggestion, but retained and still retains the diploma requirement. In 1970, Scott again switched tests, this time to a battery—the Scott Battery—that had been "validated"[9] by an expert industrial psychologist.[10] The plaintiffs contended that these requirements have a significant discriminatory impact on blacks, and that Scott had not shown these tests to be sufficiently job-related to justify their use.

The plaintiffs also alleged that Scott's system of selecting salaried supervisors discriminates against blacks. Although

6. Since 1958, Scott had required a high school diploma for all whites being hired by the mill. The same entrance criterion was imposed upon blacks in 1963, when Scott began to hire them into traditionally white lines of progression. From 1958 to 1963, however, there were no educational requirements for transfer between lines of progression.

7. Of the black employees hired before 1958 and still working as of June 1, 1972, 83 had no high school diploma or equivalent. Of the black employees hired between 1958 and 1963 and still working as of June 1, 1972, between 44 and 46 had no high school diploma or equivalent. Finally, of the 173 black employees hired before 1964 who were working as of June 1, 1972, 129, or 75%, did not have a high school diploma or equivalent.

8. The defendants used International Paper Company's "Jackson Memorandum" as a basis for drafting Scott's "Memorandum of Under-

standing". The Jackson Memorandum, an agreement between International Paper Company's Southern Kraft Division and the several unions representing its hourly wage employees, became effective August 11, 1968, and is a primary subject of the *Stevenson* litigation. *See Stevenson v. International Paper Co.,* 5 Cir. 1975, 516 F.2d 103.

9. The Bennett Mechanical Comprehension, Purdue Non-Language, and Perceptual Speed Tests are referred to collectively as the "Scott Battery".

10. The expert was, coincidentally, Dr. William Scott, an Associate Professor of Personnel and Organizational Behavior at the Graduate School of Business at Indiana University. The Scott Battery draws its name from Dr. Scott, rather than from the Scott Paper Company.

there is no assertion that Scott intended to discriminate, the appellants contend that the appointment procedure, which relies heavily upon the recommendations of front-line supervisors based on allegedly "vague and elusive" standards, is inherently discriminatory.

Finally, the plaintiff class claimed an award of back pay, regardless of Scott's good faith.

One of the plaintiffs, Will Robinson, charged Scott with firing him because of his race.

## II. THE LITIGATION BELOW

The district court found for Scott and the defendant unions on virtually every contested point. In an extensive opinion, relying heavily upon the defendants' post-trial brief, the district court found that the Memorandum of Understanding, as carried out by the defendant Scott, "successfully assured the affected class members that their opportunities for advancement at Scott would in no way be limited by any continuing effect of past discrimination". The court held that "general statistical information" was not relevant, nor was information showing how many affected class members had actually taken advantage of the opportunities offered them, when the employer had provided new opportunities that were "legally adequate".

The district court found that the statistics the plaintiffs produced, showing the difference in test scores and passing rates between blacks and whites in competition for Maintenance Department jobs, were too insubstantial to show that the tests had an adverse impact on blacks. The court found, however, that, even if there was an adverse impact, the tests were lawful for the defendant's expert had adequately demonstrated the job-relation of the Scott Battery.

The district court found that Scott did not discriminate against blacks in supervisor selection. The court found that first-line superiors did not have the ability to control who was selected for supervisory jobs, and the court approved the qualifications Scott requires of candidates for such positions, as required by business necessity.

As a result of these findings and the additional fact that Scott had not intended to discriminate and had acted all along in good faith and with the purpose of promoting equal employment opportunities, the district court denied back pay to the plaintiff class.[11]

Finally, the court held that the action taken by Scott against Will Robinson was justified by "repeated instances of negligent work performance".

## III. PRODUCTION DEPARTMENT —INTERPRETATION OF THE MEMORANDUM OF UNDERSTANDING

### A. General Remarks

In *Johnson v. Goodyear Tire & Rubber Co.,* 5 Cir. 1974, 491 F.2d 1364, 1367, we observed that "federal remedial legislation has created *a right of action ensuring that a discriminatee may be made whole for an employer's misconduct*". (Emphasis added.) Accordingly, we have condemned "neutral practices of . . . departmental seniority system[s] and . . . posting and bidding procedure[s that] carry forward into the present the stratification of black employees into lower paying, nonskill[ed] departments and jobs resulting from past discrimination". *Pettway v. American Cast Iron Pipe Co.,* 5 Cir. 1974, 494 F.2d 211, 236. The rule, adopted by this Court in *Local 189, United Papermakers and Paperworkers v. United States,* 5 Cir. 1969, 416 F.2d 980, 988, and recently endorsed by the Supreme Court in *Franks v. Bowman,* 1976, —— U.S. ——, ——, —— & n. 41, 96 S.Ct. 1251,

11. The defendants cross-appealed from that part of the district court's judgment that awarded attorneys' fees to the plaintiffs. See Part IX *infra.* There was also a cross-appeal from part of the judgment that varied from the defendants' post-trial brief in granting to blacks hired between 1958 and 1963 the right to transfer to any line of progression in the production department, regardless of the formal educational level attained. 6 FEPC at 546; see note 26 *infra.*

1265, 1271, 47 L.Ed.2d 444, 462–463, 470, 44 U.S.L.W. 4356, 4362, 4365 & n. 41, is that blacks previously discriminated against must be given such remedial relief as to enable them to achieve their "rightful place" in an employer's employment hierarchy. The rightful place theory is an equitable accommodation between two countervailing interests. The first interest is that of prior discriminatees to achieve what would have been theirs in the absence of discrimination. The countervailing interests are those of employers, employees, and consumers—in maintaining safety and efficiency—and those of employees who acquired their positions within the discriminating system and who would suffer unfairly if required to give up such positions to members of an affected class. See *Patterson v. American Tobacco Company,* 4 Cir. 1976, 535 F.2d 257.[12]

■ As we stated in *Local 189,* "[t]he crux of the problem is how far the employer must go to undo the effects of past discrimination". *Local 189,* 416 F.2d at 988. The answer is simply that the employer must go as far as he can "unless there is an overriding legitimate, nonracial business purpose". This overriding purpose can only be a purpose necessary to the safety or efficiency of a business enterprise. *United States v. Jacksonville Terminal Co.,* 5 Cir. 1971, 451 F.2d 418, 451, *cert. denied,* 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815. We have observed that

> the "business necessity" doctrine must [do] . . . more than . . . serve legitimate management functions. Otherwise, all but the most blatantly discriminatory plans would be excused even if they perpetuated the effects of past discrimination. . . . *Necessity connotes an inesistible demand.* To be preserved, [a present employment practice] . . . must not only directly foster safety and efficiency of a plant, but also be essential to those goals. . . . If the

legitimate ends of safety and efficiency can be served by a reasonably available alternative system with less discriminatory effects, then the present policies may not be continued.

*Id., quoting United States v. Bethlehem Steel Corp.,* 2 Cir. 1971, 446 F.2d 652, 662 (bracketed material and emphasis added). See also *Rodriquez v. East Texas Motor Freight,* 5 Cir. 1974, 505 F.2d 40, 56 (quoting *Bethlehem Steel*), *appeal pending.*

■ These principles have been applied time and again to strike down an employment practice that seemed neutral on its face. Here, the company's policies might seem to some not only neutral, but favorable to prior discriminatees. But the fact that Scott has made earnest efforts to eliminate the traces of its prior conduct should not obscure the real issue before us. The question is not whether the opportunities afforded by Scott were "ample" in the sense that they substantially reduced the effects of prior discrimination. The question is whether Scott has done enough. And "enough" means, for the purposes of Title VII, everything that is possible. This realm of possibility should be limited only by the most compelling business reasons. If the business can function safely and efficiently after the imposition of remedial relief, it must be subject to such remedial relief.

The appellants argue that four aspects of Scott's actions have, unnecessarily, restricted the full enjoyment of Title VII rights by the affected class. First, they contend that the affected class members were not adequately informed of their rights under the Memorandum of Understanding. Second, the appellants urge that Scott's interpretation of the Memorandum, insofar as it enables junior nonaffected class members to move up in lines of progression ahead of senior affected class members, due to the presence of a "blocking" affected class member, severely retards the advancement of

---

12. *See generally* Note, *Title VII, Seniority Discrimination and the Incumbent Negro,* 80 Harv.L.Rev. 1260, 1268–75 (1967) (effect of Civil Rights Act upon established seniority rights).

some affected class members to their rightful places. Third, they contend that by forcing affected class members to accept a cut in pay in some cases in order to transfer to a formerly all-white line of progression, Scott impedes progress to the rightful places. Finally, the appellants contend that the educational requirements imposed upon affected class members desiring to transfer to formerly all-white lines of progression are arbitrary and continue the effects of prior discrimination, in that their white contemporaries were not subject to the same educational requirements and that those educational requirements are not now justified by any business necessity. We reverse the district court's decision on each of these issues.

### B. Carrying Out the Provisions of the Memorandum

The appellants contend that "[b]ecause the affected class was not fully informed about its meaning and therefore had little access to its 'opportunities,' the Memorandum of Understanding was a useless gesture". The overwhelming evidence adduced at trial supports this contention.

■ There were numerous flaws with Scott's attempt, through brief interviews with most affected class members, to inform the affected class of its rights under the Memorandum. First, at the time of the interviews, it appears that neither of the interviewers—Giffen, Scott's chief personnel officer, and Moore, an affected class member himself and a representative of the black local union—understood, or, if they understood, attempted to convey Scott's complex interpretation of the qualification requirements provision of the Memorandum. This provision stated:

> Qualification requirements for transfer to any line of progression or for advancement in the line, will be no higher for any employee than for employees working in the line who were hired at approximately the same time.

Scott interpreted this to mean that, although a high school diploma would not be required in every line, an affected class member had to have the same level of formal education as the least educated white in the line of progression to which the affected class member wanted to transfer. The result was, as might be expected, that different lines of progression posed different formal educational barriers to transfer. For example, transfer to the Tissue Traffic line of progression required a fifth grade education; but transfer to the Tissue Shipping line of progression required a seventh grade education, and transfer to the Tissue Finishing line of progression required a tenth grade education. Notwithstanding the "least educated white man" rule and the language of the Memorandum, Scott retained high school requirements on transfer to certain lines of progression on the grounds that they involved special safety considerations or were otherwise required to be competently staffed. For example, a diploma was necessary for transfer to the Recovery Room, although a white incumbent there had only a sixth grade education.

It is obvious that an affected class member would not know to which formerly white jobs he could transfer unless a document were published containing the relevant information, or unless he were told, job by job. Yet no such document was published, and the evidence convincingly demonstrates that the affected class members were not told the details of Scott's special transfer system. Not only were affected class members not informed about educational requirements which still obtained, but some affected class members did not realize that *any* educational requirements had been *dropped.*

A serious problem with Scott's use of the Memorandum was its treatment of the automatic consideration provision. Ordinarily, an employee wishing to transfer to another line of progression had to keep himself informed about vacancies as they were posted on bulletin boards around the plant; if he were interested in a particular vacancy, he had to sign for it on a list in the personnel office. The Memorandum provided, however, that affected class members

would automatically be considered for transfers

> unless, after full explanation of their opportunities for transfer and future advancement, they elect not to be so considered and sign a waiver to that effect. This waiver can be revoked at any time at the written request of the employee.

Of the 273 affected class members who were interviewed by Giffen and Moore, 193 signed the top part of a two-part form, which reads:

> I have had explained to me and understand recent changes agreed to between the Company and the Unions which may provide me with opportunities, not provided by the basic Labor Agreement, for transfer to other jobs and future advancement in lines of progression.

These 193 were then deemed by Scott to have waived their rights to automatic consideration for transfer. Another 68 affected class members signed the bottom of the form, which reads:

> I wish to be automatically considered for all openings in jobs and lines of progression listed below and waive my rights for automatic consideration under the terms of the special agreement referred to above for all other jobs. I understand that I may withdraw this waiver as to future openings at any time by giving written notice to the Company.

These 68 listed one or more jobs or lines of progression for which they wished to be automatically considered. Twelve affected class members refused to sign either portion of the form.

Scott candidly admits that "[t]he point of the interviews was *not* to engage in a lengthy, theoretical discussion of the Memorandum's terms". "Instead, it was to translate the abstract into the specific, to find out which [affected class members] were interested in pursuing the opportunity to transfer to other lines of progression". Scott then contends that, by signing the top part of the form, affected class members indicated that they "did not wish automatic consideration for any transfers". For this sub-class of the affected class, Scott argues that further explanations were unnecessary.

We observe that the first paragraph speaks only in terms of "understanding", not in terms of "waiver", or "giving up", or "losing opportunities provided by a recent agreement negotiated with the purpose of affording you your rights". There is a world of difference between what the "waiver" actually says and the effect it had as interpreted by Scott. One may express an understanding of one's rights without, at the same time, agreeing to waive them. Thus, contrary to Scott's argument, it is not at all clear that these 193 affected class members were afforded the "one bona fide opportunity" the law requires. See *United States v. Hayes International Corp.*, 5 Cir. 1972, 456 F.2d 112, 119. Moreover, accepting for the moment the appellants' version of the interviews, Scott's approach was to ascertain whether the interviewee was "satisfied" with his present job. If so, he was asked to sign the top part of the form. Yet one may be satisfied with one's job, but desire to transfer to a better job if and when the opportunity presents itself.[13]

We also note that, by indicating interest in automatic consideration for some jobs, affected class members were forced to waive automatic consideration for all other jobs. The average affected class member might not know, at the time of his interview, what vacancies might occur or in what lines of progression he would be interested in the future.[14] Of

---

13. *See Peters v. Jefferson Chemical Co.*, 5 Cir. 1975, 516 F.2d 447, 451, where, in a Title VII sex discrimination case, we observed that an employee may express "satisfaction" with her job in order not to antagonize a supervisor, yet still desire to transfer to another job.

14. We do not mean to imply that remedial transfer rights are to remain in effect indefinitely. We have held that the rightful place doctrine requires only "one bona fide opportunity", *United States v. Hayes International Corp.*, 5 Cir. 1972, 456 F.2d 112, 119. In *Hayes*, however, the affected class members

course, an affected class member could always revoke his waiver or sign up, as other employees are required, for vacancies as they are posted. But the gist of the automatic consideration procedure is to relieve affected class members of most of the responsibility for regaining opportunities initially denied them by their employer. The importance of the automatic consideration procedure is evident here. A number of affected class members, believing either that posted educational requirements applied to them or that some lines of progression were still closed to blacks, failed to sign up for posted vacancies after having "waived" their rights to automatic consideration. Despite these problems, the district court found the waiver approach reasonable and lawful because automatic consideration of every affected class member for every job would have created a "staggering" burden for Scott. 6 FEPC at 525.

◼ We see merit in Scott's contention that not *every* affected class member should be considered for *every* opening in a formerly white line. We fail to see that the use of a waiver form, the tendency of which is to cause most affected class members to be automatically considered for a small number of jobs, is justified by business necessity. To be sure, there was evidence showing that the personnel department's task of filling job vacancies took a great deal of time. But there is no evidence showing that the procedure suggested by the appellants would take up substantially more time. One effect of automatic consideration, of course, would be the compilation of a longer list of employees from which a job vacancy would be filled. But in both the present procedure and the suggested procedure, most time is or would be spent, not in compil-

ing the list, but in interviewing in order of seniority, the highest person on the list and attempting to fill the vacancy with that person. Although it may seem probable that employees who have not specifically applied for a job are less likely to accept it, if it were offered, than employees that have bid for it, there is no evidence that this is the case.[15]

Second, even if non-bidding affected class members are more likely to refuse transfer, there are means by which the district court could have reduced the burden on Scott. Refusal of a job in a particular line of progression could, for example, be deemed a specific waiver of automatic consideration in that line.[16]

Finally, even if automatic consideration imposed a substantial burden on Scott, the business necessity test is not necessarily satisfied. By the expenditure of funds and the hiring of a larger personnel staff, Scott could decrease the time it takes to reach senior employees and, more importantly, decrease the number of rejected offers by educating affected class members about the nature of different lines of progression before allowing them to waive specific transfer rights. See *Bowe v. Colgate, Palmolive Co.*, 7 Cir. 1973, 489 F.2d 896, 900.

The inadequacies of the waiver forms might not weigh so heavily were it not for the failure of Scott adequately to explain to the interviewees their rights under the Memorandum. We consider the district court's finding to the contrary to be "clearly erroneous".

First, the district court accepted the testimony of Giffen and Moore, to the effect that the Memorandum's terms had been fully explained, over the overwhelming testimony of the interviewees that they were not told about the variegated educational requirements, that

were adequately informed about job qualifications and there was no "waiver" form similar to the one used by Scott.

**15.** It was Scott's burden, not the plaintiff's, to show how the automatic consideration procedure would destroy efficiency and safety. Giffen's patently unbelievable testimony that

three hundred affected class members would have to be interviewed for every vacancy does not carry this burden.

**16.** *See, e. g., United States v. Hayes International Corp.*, 5 Cir. 1972, 456 F.2d 112, 116; note 14 *supra*.

they were not informed about the right to automatic consideration, and that they did not realize they were signing a waiver. Indeed, the court was so convinced that each interviewee was going to testify in the same general manner that it requested during trial that plaintiffs' counsel not belabor the point. The district court said that it had been

adequately educated on the fact that the majority if not all of the members of the affected class either did not understand or did not have adequately explained to them the effects of the Memorandum . . . .

Plaintiffs' counsel remarked that, by dispensing with cumulative testimony about the nature of the interviews, the court would be impairing its ability to evaluate the pervasiveness of Scott's failures. Nevertheless, except for occasional instances where a witness was asked about specific interview incidents not already covered, the interviewee-witnesses' testimony about the failure of Giffin and Moore to explain the Memorandum was briefly summarized by counsel in a repeated "proffer".

A trial judge has discretion in eliminating cumulative testimony, but here the court's cutting off testimony on this key issue deprived it of an opportunity to be persuaded to the plaintiffs' view of the facts. Its findings are entitled, therefore, to less weight than they would be had each witness, or a large number of witnesses, testified fully as to the interview.[17]

The district court articulated two major reasons for disbelieving the interviewees. First, it relied on the fact that 193 interviewees signed the "understanding" section of the waiver form. This, of course, begs the question. The plaintiffs' theory is that the forms were *signed* without understanding. To assume that, notwithstanding strong evidence to the contrary, a signature implies understanding is to allow a rule of contract law to play too salient a part in the administration of a remedial civil rights statute. Cf. *Alexander v. Gardner-Denver Co.*, 1974, 415 U.S. 36, 51–52, 94 S.Ct. 1011, 1021–1022, 39 L.Ed.2d 147, 159–160 (Title VII rights are not waived by an employee's resort to arbitration of a claim under a nondiscrimination clause of a collective bargaining agreement).

The second reason the district court assigned for discrediting the interviewees is that the "witnesses who testified that the Memorandum was not explained to them also testified on cross-examination of their falsification of their job applications. The justification for their falsification was as repetitious as a stuck record". 6 FEPC at 525. The district court did not cite specific testimony, however, and the record contains only one instance of an employee admitting that he knowingly falsified an employment application.[18]

The court's findings on the issue of waiver cannot be examined in a vacuum. A waiver of a federal remedial right is not lightly to be inferred,[19] and the issue must be looked at in the con-

---

17. F.R.Civ.P. 52(a) provides that "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses". Where findings do not rely upon the credibility of witnesses, the force of the clearly erroneous doctrine is mitigated. *See, e. g., United States v. Stringfellow*, 5 Cir. 1969, 414 F.2d 696, 699; *A. J. Indus. Inc. v. Dayton Steel Foundry Co.*, 6 Cir. 1968, 394 F.2d 357, 361–62; *United States v. United Steelworkers of America*, 3 Cir. 1959, 271 F.2d 676, 685, *aff'd*, 361 U.S. 39, 80 S.Ct. 1, 4 L.Ed.2d 12; *Lamb v. ICC*, 10 Cir. 1958, 259 F.2d 358, 360. .

18. One affected class member testified that he did not indicate, on his initial employment application, his high school education. The asserted reason for this failure was the employ-

ee's fear that Scott would discriminate against educated blacks.

19. In *Alexander v. Gardner-Denver Co.*, 1974, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147, the Supreme Court held that an employee did not waive Title VII rights by first submitting a claim of discrimination to arbitration under a collective bargaining agreement. To be sure, the Court recognized that it was possible for an individual employee to waive Title VII rights as part of a voluntary settlement. *Id.* at 52 & n. 15, 94 S.Ct. at 1021, 39 L.Ed.2d at 160; *see United States v. Allegheny-Ludlum Indus., Inc.*, N.D.Ala.1974, 63 F.R.D. 1, 7, *aff'd*, 5 Cir. 1975, 517 F.2d 826. Nonetheless, the Supreme Court observed that there was no voluntary settlement "expressly conditioned on a waiv-

text of the racial discrimination which, for most of its existence, has characterized the mill's operation. Because we hold that, even if correctly administered, the Memorandum would not have gone far enough to obviate further remedies, the issue is not one of decisive importance. The substantive failures of the Memorandum, however, are more easily understood in light of the method by which Scott attempted to put it into effect. Cf. *Rogers v. International Paper Co.*, 8 Cir. 1975, 510 F.2d 1340, 1345 (passive and minimal recruitment efforts may justify finding of discriminatory conduct).

C. Red Circling

█ The Memorandum of Understanding provided, with one limitation, that members of the affected class could transfer to jobs in formerly all-white lines of progression without sacrificing any wages. This device, commonly known as "red circling", has been required by many courts in their attempts to remove all factors that would force affected class members seeking to achieve their rightful places "to pay a price for those opportunities". [20] The rationale behind red circling is obvious. Had members of the affected class not been discriminated against, they would have had no need to transfer into formerly all-white lines of progression to

qualify eventually for high paying jobs. A remedial program that allows blacks to transfer into formerly white lines but forces them to accept a temporary cut in pay is not an effective way of providing affected class members their rightful places. To the extent that the Memorandum requires red circling, then, it is in accordance with obvious and uncontroverted legal and practical requirements.

The Memorandum of Understanding, however, set a limit on red circling. A transferee to a formerly all-white line of progression would retain his previously higher wage, but only up to $3 an hour. Two weeks after the Memorandum went into effect, a general pay raise at Scott's Mobile mill put most black jobs over the $3 limit. Therefore, although the Memorandum was to remain in effect for two years, the red circling provision was, for practical purposes, in effect for only two weeks.

Despite these facts, the district court found that the red circling limitation was not an impediment to Title VII relief, that it was "doubtful that [the limitation] had [a deterring] effect on any who generally wished to transfer". 6 FEPC at 523. This conclusion was apparently based [21] upon the failure of most employee-witnesses to testify that they had been discouraged from transferring because of the red circling limitation.

er" of the employee's Title VII cause of action. 415 U.S. at 52 n. 15, 94 S.Ct. at 1021, 39 L.Ed.2d at 160. This observation impliedly requires a degree of specificity in Scott's waiver form, if that form is to have the effect Scott desires, that does not exist. Moreover, the Court also observed that the mere existence of an express waiver would be, of itself, insufficient to show actual waiver. In addition, it would be necessary to show, *"at the outset"*, that the waiver was "voluntary and knowing". *Id.* (emphasis added).

20. *Long v. Georgia Kraft Co.*, 5 Cir. 1971, 450 F.2d 557, 560; *see, e. g., Pettway v. American Cast Iron Pipe Co.*, 5 Cir. 1974, 494 F.2d 211, 248; *Rogers v. International Paper Co.*, 8 Cir. 1975, 510 F.2d 1340, 1355–56; *United States v. Bethlehem Steel Corp.*, 2 Cir. 1971, 446 F.2d 652, 659; *United States v. N. L. Industries, Inc.*, 8 Cir. 1973, 479 F.2d 354, 375–76; *Hicks v. Crown Zellerbach Corp.*, E.D.La.1970, 319 F.Supp. 314, 324–25; *Clark v. American Marine Corp.*, E.D.La.1969, 304 F.Supp. 603, 608;

*Robinson v. Lorillard Corp.*, M.D.N.C.1970, 319 F.Supp. 835, 842, *aff'd*, 4 Cir. 1971, 444 F.2d 791.

21. The trial court also observed that, in the two weeks between the effective date of the Memorandum and the general pay raise, "there were 16 postings for jobs in historically white lines of progression . . . [,] the average number [of affected class members] who could have filled each of these jobs was 87 . . . [, and y]et not a single affected class member took advantage of these 16 opportunities". 6 FEPC at 522. That these facts are legally significant assumes, first, that the affected class members were adequately informed about their rights under the Memorandum and, second, that a two week limitation on the right to exercise special transfer rights is proper. Neither of these assumptions is warranted on this record.

This Court, in *Stevenson v. International Paper Co.,* 5 Cir. 1975, 516 F.2d 103, recently reviewed findings of the same district court with respect to a similar red circling limitation in a memorandum which went into effect at the Mobile paper mill of Scott's competitor. To be sure, we observed there that the evidence was "scant on the existence, in fact, of any [affected class member] who was" inhibited by the $3 an hour limitation on red circling. This suggests that the district court's finding here answers the relevant legal issue. In *Stevenson,* however, we went on to state that

> [I]f the plaintiffs can demonstrate on remand that the limitation presented, *or as presently existing does present,* a practical impediment to any [affected class members,] the district court should take appropriate action. (Emphasis added.)

*Stevenson* indicates that, even if the $3 an hour limitation at one time might have been no deterrent to affected class transfer, the relevant inquiry is in the present, and not the past. It appears that the base rate of pay at Scott's Mobile mill has, for some time, been substantially higher than $3 an hour. Thus, even if *Stevenson* implicitly holds that evidence of specific deterrents must be adduced, it is inconceivable that affected class members now wishing to transfer would not be deterred by the limitation.

We find, at any rate, that *Stevenson,* in observing that there was scant evidence of an affected class member actually inhibited, did not intend to set a hard and fast rule requiring such evidence before red circling limitations would be enjoined. *Stevenson* recognized that "[i]t is now clear that red circling is a necessary element of a Title VII remedy in most cases", citing *Pettway v. American Cast Iron Pipe Co.,* 5 Cir. 1974, 494 F.2d 211, 248. Neither *Pettway,* nor any of the other red circling cases that have come to our attention, suggests that a limitation on red circling is justifiable. Instead, the cases make clear that red circling is to be com-

plete.[22] Any limitation on red circling requires an affected class member to pay a price for an opportunity provided by Title VII. In view of the unanimity of the red circling decisions, *Stevenson* cannot be found to have created a new rule for the Fifth Circuit merely by observing that the plaintiffs must demonstrate that the limitation constituted "a practical impediment".

■ The district court, in finding significant that "all employees, when seeking to advance in a new line of progression, must be willing to take an initial pay cut in order to eventually earn larger salaries in more desirable jobs", incorrectly stated Title VII law and ignored the rationale of red circling. That rationale is, simply, that the reduction in wage constitutes a term or condition of employment that discriminates against the affected class members on the basis of race. *Robinson v. Lorillard Corp.,* M.D.N.C.1970, 319 F.Supp. 835, 842, aff'd, 4 Cir. 1971, 444 F.2d 791.

### D. Blocking

The Memorandum specifies that contract, or job,

> seniority will continue to be applied in all transfer and promotion situations except where "affected class" employees are competing with one or more employees who are not members of the "affected class" in which case mill seniority dates will be used *for all competing employees.*

(Emphasis added) The plaintiffs contended at trial that Scott's misapplication of this rule has resulted in a "blocking" phenomenon.

The district court correctly described Scott's procedures as follows:

> In a case where two or more affected class members compete with non-members, the Memorandum of Understanding requires a three-step procedure. First, affected class members are compared to one another on the basis of contract seniority. Second, the non-members are also compared with one another on the basis of con-

---

22. *See especially Rogers v. International Paper Co.,* 510 F.2d at 1356.

tract seniority. Third, the two surviving employees are compared on the basis of mill seniority, with the more senior man winning the competition. 6 FEPC at 529–30. The district court found this practice justifiable because "[i]t would be totally unfair now to permit . . . affected class members who hung back at a time when they could have transferred to now go around the affected class members who had the initiative to transfer at an earlier date" and, in so doing, "sacrificed between four and seven years of mill seniority and perhaps had to take a cut in pay". Id. at 530–31. The appellants contend that a correct interpretation of the Memorandum, and of Scott's Title VII obligations, requires mill seniority to prevail unless no non-affected class member is competing with an affected class member. We agree with this contention.

The problem can best be understood by reference to the accompanying hypothetical cases.

Seniority Chart

| Case I. | Mill | Contract | Case II. | Mill | Contract |
| --- | --- | --- | --- | --- | --- |
| $AC_1$ | 8 | 1 | $AC_1$ | 8 | 1 |
| $AC_2$ | 4 | 3 | $AC_2$ | 7 | 3 |
| NAC | 6 | 2 | NAC | 6 | 2 |
| Case III. | Mill | Contract | Case IV. | Mill | Contract |
| $AC_1$ | 8 | 1 | $AC_1$ | 8 | 1 |
| $AC_2$ | 4 | 2 | $AC_2$ | 7 | 2 |
| NAC | 6 | 3 | NAC | 6 | 3 |

$AC_1$, $AC_2$, and NAC are employees, the first two belonging to the affected class and the last not belonging to the affected class. In each case, all three employees bid for a vacancy in a better job. In Cases II and IV, Scott's three-step procedure enables $AC_2$ to prevail over NAC. Assuming that $AC_1$ and $AC_2$ had an equal opportunity to transfer into their current line of progression,[23] this system does indeed reward the employee who took the initiative.

Even with the same assumption, however, this system operates unfairly in Cases I and III. Here, $AC_2$ does not prevail, but NAC does. This is unfair to $AC_1$, for had $AC_2$ not bid on the vacancy, $AC_1$ would have won the mill seniority competition. Under Scott's interpretation, $AC_2$ "blocks" $AC_1$, but does not himself get the vacancy. How this can reward $AC_2$'s initiative is beyond understanding.

The appellants' proposed, alternative system may be easily stated: whenever an affected class member and a nonaffected class member compete for the same job, the employee with the greatest mill seniority is to prevail. When the only competing bidders are affected class members, contract seniority will govern. This system more adequately secures affected class members rightful places.

We note, however, that this system is not without its peculiarities. In Cases I and III, $AC_1$ will win the bidding if NAC bids. However, if NAC does not bid, leaving only $AC_1$ and $AC_2$ in the picture, the usual seniority system awards the vacancy to $AC_2$, the employee with the greatest job seniority. Since NAC will probably not bid (as he will likely know that, if he does, $AC_1$ will win the competition), $AC_2$ will move up first. He will be followed by $AC_1$ and then by NAC. But even under the appellants' system, NAC may bid, either because he does not realize who else will bid or because he hopes that a senior bidder will later decide not to take the job. If he does bid, then $AC_1$ "jumps" over $AC_2$.

This fortuity does not require us to discard, however, an otherwise equitable system and replace it with a less equitable system. It may be that no system could be devised that was totally devoid of eccentricity. It is clear, however, that Scott's device of playing off affected class members against each other on the basis of contract seniority, and using mill seniority only in the third step of a three-step procedure, is more than

**23.** Many affected class members had no opportunity to exercise "initiative" because they were prevented from transferring to formerly white lines of progression by unlawful education requirements and the age requirements. Moreover, other affected class members, as we hold below, were illegally prohibited from transferring even after the adoption of the Memorandum of Understanding.

eccentric. It continues the effects of past discrimination without being justified by compelling business necessity.

On remand, the district court should order the appellants' proposed system into effect, modified only by refinements, if any appear, that eliminate the peculiarities we have noted without allowing non-affected class members to proceed at the expense of mill senior affected class members.[24]

### E. Educational Requirements for Transfer to Production Jobs

The Memorandum of Understanding provided that

> Qualification requirements for transfer to any line of progression or for advancement in the line, will be no higher for any employee than for employees working in the line who were hired at approximately the same time.

As we mentioned before with respect to the question whether interviewees were properly informed about the effects of the Memorandum, Scott adopted a system which employed cutoff levels from fourth grade to high school diploma, depending upon the line of progression. The imposition of any educational requirements on the affected class is challenged by the appellants. They contend that, because they were absolutely prohibited from entering white lines of progression when they first were employed by Scott, no educational requirements whatsoever may now be imposed on

transfer to such lines.[25] In the event, however, that Title VII allows some educational requirements, the appellants argue that the requirements actually employed by Scott have not, and cannot, be shown to be justified by a business necessity.

Scott, on the other hand, argues that Title VII does not require remedial action if an employee was not discriminated against originally. Although Scott admits that segregated lines of progression were maintained until 1963, it argues that affected class members with less formal education than any non-affected class member in a particular line of progression were not discriminated against and would not have received a job in that line in the absence of segregation. As support for this argument, Scott points to testimony of its Manager of Administrative Services that the best applicant was always chosen for a job opening even when Scott did not have a formal high school diploma requirement. The district court found that "Memorandum imposed no requirements on blacks that were higher than requirements imposed on whites who were hired at or about the same time and accordingly [was] not in terms discriminatory" 6 FEPC at 546. Finally, the district court held that the educational requirements were "justified by business necessity and thus . . . legal in any event".[26] *Id.*

In *Griggs v. Duke Power Co.*, 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d

---

**24.** The system we approve here has been adopted by one district court in two consent decrees. *See Bumpers v. National Gypsum Co.*, Civ. # 7843–73–P, S.D.Ala.1974, slip op. at 3, 5; *Suggs v. Container Corp. of America*, Civ. # 7058–72–P, S.D.Ala.1974, slip op. at 8.

**25.** To this extent, appellants contend that the Memorandum, even if properly applied, did not go far enough in the Production Department.

**26.** The district court's conclusion that the educational requirements were lawfully imposed upon the affected class was limited by a perplexing distinction drawn between affected class members hired while whites were required to have high school diplomas and affected class members hired before whites were required to have high school diplomas. The court concluded that

requiring affected class members who were employed between 1958 and 1963 who have not achieved a high school or GED equivalent to bid against white employees who were employed at the same time and had to have a high school achievement is discriminating. Obviously, there are whites who were employed prior to 1959 without a high school achievement who are adequately performing their functions. This segment of the affected class are not to be required to have a higher educational level than those whites employed prior to 1959.

6 FEPC at 546. First, we suggest that if a distinction is to be drawn between these two segments of the affected class, the opposite conclusion should be drawn, because the pre-1958 black hirees were more obviously discriminated against than the later black hirees. Second, and more important, the district

158, the Supreme Court held that a high school requirement having a discriminatory impact on hiring was not supportable under Title VII. The Court, rejecting the high school requirement because it had been instituted merely upon the employer's judgment that it would generally improve the overall quality of the work force, stated that

> [t]he Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

*Id.* at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 164. The first step in the relevant inquiry is whether the practice of Scott is "discriminatory in operation".

### 1. Discriminatory In Operation

■ We note, first, that the district court observed that "the [education] requirements were not shown to have had an adverse impact on black employees by disqualifying more black than white employees". 6 FEPC at 546. This observation is erroneous. Since no whites are in the affected class, any restriction on the affected class holds back more blacks than whites. In any event, this was not the basis from which to judge whether the employment practice here was discriminatory in operation.

■ An employment practice is discriminatory in operation with respect to an affected class if it retards the advancement of qualified class members to jobs they might have had in the absence of discrimination. See, e.g., *Local 189*, 416 F.2d at 983. It is indeed difficult to tell from the record whether Scott's educational requirements are discriminatory in operation. The mere fact, however, that Scott always hired the best quali-

fied white applicant does not answer the relevant question. A black with a fourth grade education might conceivably have secured a job ahead of a white with a sixth grade education had there been no discrimination. On the other hand, if the disparity, between education levels of rejected black applicants and accepted whites, approaches four or five years, it seems much more likely that the black would not have achieved the job appointment notwithstanding discrimination.

■ If the burden of proof at this juncture rested on the plaintiffs, we would be bound, under the "clearly erroneous" doctrine, to affirm the district court's implicit finding that formal educational levels did indeed play a determining part in Scott's pre-1958 initial employment decisions. Once it has been shown, however, that an employer was discriminating against a class of employees, the employer must shoulder the burden of persuasion to show that a particular employee was unqualified for a position in an all-white line of progression. Cf. *Franks v. Bowman*, 1976, —— U.S. ——, ——, 96 S.Ct. 1251, 1268, 47 L.Ed.2d 444, 466, 44 U.S.L.W. 4356, 4363. In *Jacksonville Terminal Co.*, the district court had found that the government had failed or refused

> to undertake a comparative evaluation of the entitlement to job vacancies of competing Negroes and whites, upon the basis of individual qualifications, [which left] the record without probative evidence to support [the contention that black employees were not even considered for jobs given to whites] . . . . [P]roof that whites were hired into jobs despite qualifications less or equal to those of competing Negroes was not produced.

*United States v. Jacksonville Terminal Co.*, M.D.Fla.1970, 316 F.Supp. 567, 581. On appeal, we cautioned that

court's conclusion here demonstrates that it actually *was* convinced that Scott's educational requirements were not justified by business necessity. We note that this portion of the district court's opinion was not adopted verbatim from the defendants' proposed findings and conclusions. The obvious inconsistency

between the court's personal conclusions and its conclusions as recommended by one of the parties demonstrates the hazards of placing too much reliance upon the parties in the formulation of an opinion. *Cf. Louis Dreyfus & Cie. v. Panama Canal Co.*, 5 Cir. 1962, 298 F.2d 733, 738–39 (findings of fact).

[t]he trial judge's pronouncement cannot function as a general rule. *It becomes valid only when the employer . . . evidentially demonstrates that objective criteria pertinent to the particular job are the determinants of who is "best qualified".*

451 F.2d at 442 (emphasis added). We then considered the actual facts of the employer's hiring practices and found that there were many instances in which the "best qualified" individual had in fact been given jobs, and that the absence of blacks from skilled positions was accounted for by the fact that the general decline of the railroad industry had caused "many white workers experienced in skilled jobs" to be available in the railroad labor market. *Id.* at 445. The employer in *Jacksonville Terminal* had adequately carried its burden. This is not so, however, with respect to Scott. All the record contains is the bald statement of one official that the "best qualified" applicant was always hired for an opening. It was just such an assertion, however, which did not, in *Jacksonville Terminal Co.,* justify the district court's rejection of a claim of discrimination without putting the *employer* to the test.

▇ In *Jacksonville Terminal Co.* employment practices were *alleged* to be overtly discriminatory; here the employment practices were once admittedly discriminatory, and the question is who, in fact, was discriminated against. The relevant question in both cases is "to what extent was there discrimination?" We

conclude that Scott has not shown that members of the affected class, with lower formal educational status than the "least educated white", would not have achieved "white" jobs in the absence of discrimination.[27]

▇ Scott is to be afforded an opportunity, however, to show that particular members of the affected class would not have received jobs in white lines of progression in the absence of discrimination. This opportunity is required by *Franks v. Bowman,* 1976, —— U.S. ——, ——, 96 S.Ct. 1251, 1268, 47 L.Ed.2d 444, 466, 44 U.S.L.W. 4356, 4363. There, in rejecting a district court's denial of constructive seniority from the time of initial employment applications, the Supreme Court stated that

> at such time as individual class members seek positions . . . for which they are presumptively entitled to priority hiring consideration . . . , evidence that particular individuals were not in fact victims of racial discrimination will be material.

We caution, however, as did the Supreme Court, that "the burden will be upon [the employer] to prove that individuals who reapply were not in fact victims of previous hiring discrimination" and that if such proof is to be a showing that the individual was not qualified, the employer must show non-qualification "under nondiscriminatory standards *actually applied* . . . to individuals who were in fact hired

---

**27.** Our conclusion is influenced in part by our examination of other cases which have held that formal education requirements imposed upon an affected class, but not imposed upon the contemporaries of that class, violate Title VII. In these cases, when the employer was ordered to discontinue the formal education requirement there was no limitation to that order keyed to the "least educated white man" in a particular line of progression. *See, e. g., Pettway v. American Cast Iron Pipe Co.,* 5 Cir. 1974, 494 F.2d 211, 245; *Johnson v. Goodyear Tire & Rubber Co.,* 5 Cir. 1974, 491 F.2d 1364, 1370, aff'g S.D.Tex.1972, 349 F.Supp. 3, 14, 17; *Griggs v. Duke Power Co.,* 4 Cir. 1970, 420 F.2d 1225, 1230-31, *rev'd on other grounds,* 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158; *Broussard v. Schlumberger Well Servs.,*

S.D.Tex.1970, 315 F.Supp. 506, 512. *See also* EEOC Guideline 1607.11, 29 C.F.R. 1607.11:

> No employee selection standard can be imposed upon a class of individuals protected by Title VII who, but for prior discrimination, would have been granted *the opportunity* to qualify under less stringent selection standards previously in force.

(emphasis added) This Guideline does not require that the affected class member show that he would have been *able* to qualify in the absence of discrimination; it requires only that he show that he lost the *opportunity* to qualify. (Of course, this Guideline goes a step farther than does the rule we set forth in *Local 189,* for it does not allow consideration of whether a newly imposed requirement might be a business necessity.)

. . . .". *Id.* at ——, 96 S.Ct. at 1268, 47 L.Ed.2d at 466, 44 U.S.L.W. at 4363 & n. 32.

### 2. Lack of Justification by Business Necessity

The district court found that all of Scott's educational requirements were justified by business necessity.[28] With respect to jobs in the Chemical Recovery line, for example, the court found that employees

> must be able to monitor a complex control panel in order to prevent explosive situations from developing in the boilers. Failure of the workers to do their job properly would put all of the employees in the entire plant in extreme danger.

6 FEPC at 523.. The court approved of Scott's high school requirements for the Bleach Plant and P & C Technical Control lines because they required that the workers "employ laboratory techniques"; the trial judge noted, as an example, that the employee in the top job in the Technical Control line "must be able to prepare all the chemicals needed for the laboratory's operations". *Id.* Finally, the district court approved of the high school requirement for the job of Scaler, because

> Scott expends some $21 million annually for wood on the basis of the tickets submitted by the Scalers. [N]o one in the Controller's Office checks, or could check, the accuracy of these tickets.

*Id.* at 524. With respect to the lines of progression or jobs in which Scott re-duced transfer requirements for affected class members, the district court concluded

> It was . . . *obvious* that Scott could not abandon all educational requirements and incur the risk that older employees with little or no schooling would use their substantial mill seniority to move into demanding positions for which they could not reasonably expect to qualify without extremely long training periods, *if then.*

*Id.* at 523 (emphasis added).

### (a). High School Requirement

The district court was obviously concerned about the advisability of putting affected class members into lines of progression where they might not be qualified for the top job at the time of transfer. The Supreme Court has provided instruction in this area.

In *Griggs*, the Supreme Court held that a high school diploma requirement for hiring and transfer was not justified by business necessity, where a finding that "white employees hired before the time of the high school education requirement continued to perform satisfactorily and achieve promotions" was not challenged. There was no basis, therefore, for the employer's contention that the requirement served its "avowed policy of advancement", and the Court did not find it necessary to decide whether that contention, if factually supported, would be legally relevant. In *Albemarle Paper Co. v. Moody*, 1975, 422

---

**28.** The Court of Appeals decision in the *Griggs* case is cited by the appellants as standing for the proposition that the educational requirements cannot be imposed, regardless of business necessity. In that case, the Court of Appeals held that six blacks who were hired before the employer imposed the high school requirement were entitled to relief. Although the employer could continue to require diplomas in his initial hiring decisions, the educational requirement for transfer was to be "waived" as to these six blacks. 420 F.2d at 1231. The Supreme Court reversed the holding that the high school requirement was permissible for new employees. *Griggs v. Duke Power Co.,* 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158. The Supreme Court noted the Court of Appeals' action, 401 U.S. at 429 & n. 4, 91 S.Ct. at 852, 28 L.Ed.2d at 163, but stated that it had granted certiorari on the claim that the Court of Appeals had erred in holding that the employer's good faith and the requirements' relation to general intelligence satisfied Title VII. *Id.* at 429, 91 S.Ct. at 852, 28 L.Ed.2d at 163. There was no comment concerning the correctness of the "waiver" part of the lower court's holding, for the requirements were found not to be job-related anyway. It is incorrect, therefore, to describe the Supreme Court decision as "affirming in pertinent part" the Court of Appeals decision. Instead, with respect to the "waiver" portion of its opinion, the Court of Appeals was "reversed on other grounds" by the Supreme Court.

U.S. 405, 434, 95 S.Ct. 2362, 2379, 45 L.Ed.2d 280, 305–06, the Supreme Court again addressed this issue, this time with respect to the validation of a test requirement. The Court "endorsed" EEOC Guideline 1607.4(c)(1), 29 C.F.R. § 1607.-4(c)(1), which provides:

> If job progression structures and seniority provision are so established that new employees will probably, within a reasonable period of time and in a great majority of cases, progress to a higher level, it may be considered that candidates are being evaluated for jobs at that higher level. However, where job progression is not so nearly automatic, or the time span is such that higher level jobs or employees' potential may be expected to change in significant ways, it shall be considered that candidates are being evaluated for a job at 'or near the entry level.

The Court warned, therefore, that conclusions drawn about the job-relatedness of a requirement be tempered with considerations of

> the normal speed of promotion, . . the efficacy of on-the-job training in the scheme of promotion, and . . the possible use of testing as a promotion device, rather than as a screen for entry into low level jobs.

*Id.* It does not appear that the decision of the district court satisfies the requirements set forth in *Moody*, in that the decision focuses only on "top jobs", and does not show why on-the-job training is unefficacious. This shortcoming is understandable in light of the fact that the district court's decision predated the Supreme Court's decision by about two years. Nevertheless, present equitable standards must govern this appeal.

Here, the district court found that the high school requirement was adopted by

Scott because Scott had found it "helpful in selecting the best people for training" at another paper mill. 6 FEPC at 518. The court found this requirement justified because "[n]ew, more sophisticated equipment was coming into use". *Id.* The court recognized, however, that there were some employees in lines of progression who had failed to earn a high school diploma. It explained that "these employees were able to make up for this by growing with the job as new machinery was adopted". The court went on to say that

> It was not shown however, that these non-high school graduates are equal in performance with those who had finished high school. An employee entering the line for the first time would, of course, not have this advantage of prior training, so that his lack of education would be a far more serious obstacle to his learning the job.

*Id.* at 519 (emphasis added).

The district court seems to have been under the impression that it was the plaintiff's responsibility to prove that non-high school graduates are currently equal in performance to high school graduates in formerly white lines of progression. This is backwards. If Scott wishes to validate any barrier to the advancement of affected class members to their rightful places, it has the burden of showing business necessity. Then, even assuming that non-high school graduates do not perform *as well as* high school graduates, the question should be whether non-high school graduates perform *adequately*. For only if the diplomaless individual is not adequate to a job may his exclusion from that job be deemed a business necessity.[29] Next, the fact that lack of a diploma may be a "serious obstacle" to

---

**29.** *See, e. g., Dozier v. Chupka,* S.D.Ohio 1975, 395 F.Supp. 836, 850 (overturning high school requirement for employment in fire department, noting that non-high school graduates already in the department "continue to perform their duties"); *cf. Stamps v. Detroit Edison Co.,* S.D.Mich.1973, 365 F.Supp. 87, 118 (cut-off scores on employment tests, in order to be valid, must not be higher than those of employees "who have been *sufficiently* able to perform in the past" (emphasis added).

Commentators have been almost unanimous in their condemnation of "best qualified" hiring practices. *See Bernhardt, Griggs v. Duke Power Co.: The Implications for Private and Public Employers,* 50 Tex.L.Rev. 901, 916 (1972); Note, *Employment Discrimination:*

an individual learning a job—and we assume for the purposes of this observation that the district court felt that there would be an obstacle to learning an entry level job—does not show that the diploma is a business necessity. For all that the district court's findings show, on-the-job training could, within a relatively short time, make up the disparity between the diploma holder and the non-diploma holder.[30]

The problems in the district court's reasoning are particularly distressing where, as here, the record demonstrates that there may well be no business necessity for the diploma requirement. First, as in Moody, there are non-high school graduates in the relevant lines of progression who are performing "adequately". This was "obvious" to the district court in its Conclusions of Law. 6 FEPC at 546. Second, the labor agreement between Scott and the various unions demonstrates that a promotee or transferee's ability to perform a job is often considered after promotion or transfer. Thus, a new employee is on probationary status for ninety days before becoming a permanent employee. Furthermore, "[w]hen an employee is permanently promoted to a higher job and feels he is unable to or fails to perform adequately the work of the higher job, he will be able to go back to his former job", and, after six months more training, again be considered for promotion. Labor Agreement Effective June 1, 1968, § 9. Clearly, even under current practice at Scott's plant, there is some give and take for on-the-job self-selection, evaluation, and training. If current procedures were inadequate to protect Scott from the possibility of putting unqualified workers into sensitive positions, it is still possible that enlargements of probationary periods or intensive training programs would have met the requirements of business necessity. It is certain that such modifications would have been less restrictive to the affected class than wholesale exclusion. The Supreme Court declared in Moody, 422 U.S. at 425, 95 S.Ct. at 2375, 45 L.Ed.2d at 301, that

> [i]f an employer does . . . meet the burden of proving that its tests are "job related," it remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in "efficient and trustworthy workmanship."

It is clear that business necessity is limited to those cases where an employer has no other choice. Here, even if the diploma requirement is job-related, it is likely that its abrogation will not result in unqualified employees being thrown into impossible situations, an outcome clearly not intended by Title VII. Because we hold, however, that Scott has failed in its effort to prove job-relatedness, we do not actually reach the is-

---

*The Burden is on Business,* 31 Md.L.Rev. 255, 267 (1971); Blumrosen, *The Duty of Fair Recruitment Under the Civil Rights Act of 1964,* 22 Rutgers L.Rev. 465, 498 (1968); 52 N.C.L. Rev. 181, 190 (1973); Note, *Legal Implications of the Use of Standardized Ability Tests in Employment and Education,* 68 Colum.L.Rev. 691, 712 (1968). *But see* Fiss, *A Theory of Fair Employment Laws,* 38 U.Chi.L.Rev. 235, 303 (1968).

**30.** We reject, as unsupported by any evidence, the district court's conclusion that a high school diploma "increases tremendously the odds that" a person could be trained to perform in one of the "sensitive" lines of progression. *See* 6 FEPC at 523. The court's conclusion was based on its assumption that the creation and validation of a test that more precisely screened applicants would be very ex-

pensive, and that, because of the occasional nature of job vacancies, "the simplicity of a high school requirement seems all the more justifiable". *Id.* at 523–24 n. 14. We believe, however, that, even if the creation and validation of screening tests is expensive, the expense is a burden the employer must bear if it desires to use tests that operate discriminatorily or perpetuate the effects of past discrimination. Furthermore, the Supreme Court explicitly stated in *Griggs* that "Congress . . . commanded . . . that any tests used must measure the person for the job and not the person in the abstract". 401 U.S. at 436, 91 S.Ct. at 856, 28 L.Ed.2d at 167. The district court's attempt to justify the diploma requirement on the ground of simplicity seems but an end run around the teaching of *Griggs*.

sue of whether less restrictive employment alternatives were available.

We held in *Pettway*, 494 F.2d at 237–38, that a high school diploma requirement was invalid when the employer was attempting to find employees who had "a certain reading level and familiarity with study techniques necessary to participate in the course work of the apprentice program". Similarly, we struck down a diploma requirement in *United States v. Georgia Power Co.*, 5 Cir. 1973, 474 F.2d 906, 918, where the justification offered at trial was similar to that offered here: that there was an "eventual need for above-average ability to read and comprehend the increasingly technical maintenance manuals, the training bulletins, operating instructions, forms and the like demanded by the sophisticated industry . . .".

As the *Griggs* Court observed, 401 U.S. at 433, 91 S.Ct. at 854, 28 L.Ed.2d at 165,

> History is filled with examples of men and women who rendered highly effective performance without the conventional badges of accomplishment in terms of certificates, diplomas, or degrees. Diplomas and tests are useful servants, but Congress has mandated the commonsense proposition that they are not to become masters of reality.

■ The use of a diploma requirement seems predicated on the assumption that high school graduates will be able to read, to learn, and to achieve in industry because they were able to

achieve in school. This assumption does not meet the demanding standards of Title VII. Dropping out of school may have resulted from the dropout's being obliged to work to support his family, and not necessarily from inability to achieve the skills demanded by an employer. Finally, even if graduation conclusively shows some achievement, there is no necessary correlation between that achievement and job performance. Graduation from high school demonstrates an ability to pass the various tests administered by the particular school. Certainly, where so many kinds of employment tests have been shown to be unrelated to job performance, it is likely that high school tests, not even designed to predict performance, are subject to the same flaws.[31]

In short, we hold that the record in this case provided no basis by which the district court could have deemed the high school requirement for transfer to four jobs or lines of progression required by business necessity. Its finding to that effect is, therefore, clearly erroneous.[32]

(b). *Other Educational Requirements for Transfer*

No case law has been cited or discovered that deals with the question whether grade school achievement less than a high school diploma may be a transfer prerequisite justifiably imposed on an affected class. Our discussion of the diploma requirement itself is, however, broad enough to, and does, control here. The

---

**31.** *See Johnson v. Goodyear Tire & Rubber Co.*, 5 Cir. 1974, 491 F.2d 1364, 1371–72. There, in affirming a district court's injunction preventing further use of a diploma requirement, we noted that the employer had never attempted to validate that criterion. We cited the EEOC Guidelines for validation, 29 C.F.R. §§ 1607.1–14, and noted that the failure to validate *compelled* the conclusion that the requirement was invalid.

**32.** We note that two cases, from other circuits, have upheld the use of formal education requirements despite the possibility of adverse racial effects. *See Spurlock v. United Airlines, Inc.*, 10 Cir. 1972, 475 F.2d 216, *criticized in* 52 N.C.L.Rev. 181 (1973) (college degree for entrance into flight officer training program);

*Castro v. Beecher*, 1 Cir. 1972, 459 F.2d 725, 735 (high school diploma for entrance to police department). These cases are factually distinguishable from the instant case, however. In *Spurlock*, the college requirement could be waived if the applicant had had sufficient experience on high-speed jets, and the rigorous training program involved classroom experiences very similar to those provided by college; in *Castro*, a "meaningful study", in the language of *Griggs*, had been accomplished by, among others, a President's Commission on Law Enforcement and the Administration of Justice. To the extent that these cases vary from our analysis of Scott's diploma requirement, we find them unpersuasive.

biggest problem with requiring grade school achievement is that such a requirement rests on an assumption not entitled to protection from Title VII scrutiny: that the failure to achieve in school reflects an inability to achieve on the job. Grade school achievement requirements have never been validated by Scott or, to our knowledge, by any other manufacturer. As we said before, Scott's promotion system is already flexible enough to accommodate trainees, and transferring affected class members will not be advanced to the most difficult positions without an opportunity to acquire necessary skills. In these circumstances, the grade school achievement requirements cannot stand.

## IV. PRODUCTION DEPARTMENT —STRUCTURAL CHANGES THAT MIGHT REMEDY ADVERSE EFFECTS OF PRIOR DISCRIMINATION

The Memorandum stated that the question of "revisions" in lines of progression would be referred to negotiations between Scott and the unions. An agreement with respect to the merger of progression lines was to be reached within 90 days of the ratification of the Memorandum, and further meetings were to determine which lines could be shortened, and which jobs, if any, could be skipped in advancing within or transferring between lines. Despite this agreement, no substantial changes were made in job structure at Scott's mill. Although Scott cites four cases in which it revised job structures so as "to afford black employees better advancement opportunities", these revisions, in large part, resulted only in white jobs being "stacked" on top of black jobs. Thus, although it is true that a majority of affected class members are now in formerly all-white lines, the requirement that jobs be held in sequential order in

any line of progression has the tendency to "lock in" formerly discriminated-against blacks.

We have held that, consistent with an employer's

legitimate interest in maintaining the skill and efficiency of its labor force, . . . any structural impediments which delay the attainment by Negroes of jobs generally as good as those held by their white contemporaries or which force Negroes to pay a price for those opportunities are required by law to be removed.

*Long v. Georgia Kraft Co.*, 5 Cir. 1971, 450 F.2d 557, 560, *quoting United States v. Local 189, United Papermakers and Paperworkers*, E.D.La.1969, 301 F.Supp. 906, 917, *aff'd*, 5 Cir. 1969, 416 F.2d 980, *cert. denied*, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100. The removal of structural impediments has called, in other cases, for advanced level entry and job skipping. See, e. g., *Pettway*, 494 F.2d at 248–49 & n. 106; *United States v. Hayes International Corp.*, 5 Cir. 1972, 456 F.2d 112, 116–19; *Long*, 450 F.2d at 562.

 In this case, however, the district court ordered no mergers, no advanced level entry, and no job skipping. Its detailed findings of fact explain why, according to the court, mergers were unnecessary in a number of cases, or were infeasible in other cases. Although we cannot say that these findings are clearly erroneous, the issue does not end there. There were no detailed findings, or findings of any kind, for that matter, concerning the possibility of advanced level entry and job skipping. It was Scott's responsibility to show that any impediments to affected class members' rightful places were justified by business necessity. *Stevenson v. International Paper Co.*, 5 Cir. 1975, 516 F.2d 103, 114–15. This was not done.[33] As in *Steven-*

---

**33.** Scott contends that the plaintiffs are seeking, on appeal, a type of relief that it had not sought before the district court originally. A review of the pre-trial proceedings shows this contention to be unfounded. The complaint, filed in 1971, alleged simply that Scott's hiring

and promotion practices were discriminatory. In its amended complaint, filed in 1972, the plaintiffs charged that the defendants' "system for promotion, transfer, and seniority, . . . has the design . . . [of] continu[ing] and preserv[ing] the defendants'" practice of ra-

*son,* we remand for further consideration in the light of *Pettway* the issues of job skipping and advanced level entry.[34]

## V. MAINTENANCE DEPARTMENT

The employees contend that any test or educational requirements imposed upon affected class members for transfer to the Maintenance Department is per se illegal. With respect to the rest of the plaintiff class, the appellants allege that the requirements for entrance into Maintenance discriminate against black candidates. Finally, appellants contend that none of Scott's Maintenance Department requirements is valid under the appropriate EEOC Guidelines.

Scott, on the other hand, argues that, even with respect to the affected class, such requirements may be imposed. This is because they are allegedly related to job performance and because affected class members are not " 'locked in' to low-paying jobs without advancement or transfer opportunities". Scott also argues that there has been no showing of a disparate racial impact with respect to the high school requirement or the Scott Battery test. Finally, Scott contends that all of its Maintenance Department requirements are justified by business necessity and have been professionally validated by an expert in industrial psychology.

The district court agreed with Scott's contentions. Specifically, the court found that "[t]he requirement that applicants for [Maintenance] vacancies have a high school education [was] not shown to

have an adverse impact on blacks by eliminating disproportionately more blacks than whites . . .". 6 FEPC at 547. Moreover, Scott was held to have shown that the high school requirement was a business necessity because it "greatly increases the likelihood that the applicant's intelligence, learning ability, and persistence will be adequate to assure successful completion of the approximately four years of training required to be a Journeyman". *Id.* With respect to the Scott Battery, the court found that the plaintiffs' statistics "were too insubstantial to show that the tests have an adverse impact . . .". *Id.* Finally, the court held that the validation study conducted by Scott's expert, Dr. Scott, was adequate to show job-relatedness "even if it did not happen to conform in all details to particular governmental guidelines, for such guidelines are intended as just that, guidelines rather than rigid rules". *Id.* at 548.

### A. High School Requirement

We have already held that the high school diploma requirement is not justified by business necessity with respect to transfers between production lines of progression. We recognize that there are differences between the systems of progression in the Production Department and in the Maintenance Department. In Production, progression depends very much on what vacancies are open, the employee's motivation to bid for them, and comparative seniority. In Maintenance, progress during the early years as a helper is more or less auto-

cial discrimination. The amended complaint sought injunctive relief from such employment practices which limited or otherwise interfered with the plaintiffs' rights to equal employment opportunities. Finally, the Pretrial Order of 1973 indicated that the following was a disputed fact: "To what extent has the Memorandum of Understanding (a) eliminated continuing discrimination and (b) remedied the present effects of past discrimination?" This was sufficient to raise the issue of advanced level entry and job skipping at the time of trial, and the record does not demonstrate that the plaintiffs decided in the midst of the litigation to give up their rights to general equitable relief. The district court's conclusion of law, to the effect that "there is no need for Scott to

restructure lines of progression any further, *or to institute special provisions for job skipping or advanced level entry*" (emphasis added), establishes that the issue was, in fact, ruled on below.

34. The district court's opinion reveals a misconception about the type of relief being sought by the plaintiffs. The plaintiffs were seeking structural modification, not for every black employee, but only for the members of the affected class. Although Scott could, if it wanted to, bargain to make those modifications apply to all employees, it need not extend those opportunities to all employees.

matic, but advancement to Journeyman status depends more upon qualifications.[35] The differences between the two departments are not so significant, however, as to require a different result. The high school requirement is not a business necessity and cannot, therefore, be imposed upon members of the affected class who would have been able to transfer, except for race, prior to the date in 1958 that the diploma requirement was placed on whites.

■ For those blacks who, after that date, were ineligible for transfer because they lacked a high school diploma, the trial court's observation that the requirement did not have a disproportionate impact on blacks is more relevant. The record is meager on this subject, and although it is the plaintiff's burden to prove disproportionate impact, it stretches the imagination to believe that blacks have not been more seriously affected than whites. Statistical data not introduced at trial but nevertheless available to the district court show that blacks generally were graduated from high school at a lower rate than whites. See, e. g., *Johnson*, 491 F.2d at 1371; *Georgia Power Co.*, 474 F.2d at 918.[36] Indeed, the provision of the Memorandum of Understanding that abrogates the diploma requirement for transfer *within* the Production Department is meaningless unless blacks were handicapped by such a requirement. The lack of concentration on this area during the trial can only be explained by surmising that the disproportionate impact of the high school requirement was recognized by all. In short, the district court's finding is unsupportable and, therefore, clearly erroneous.

Because of the disproportionate impact, it was Scott's responsibility to prove at least that the high school requirement was job-related. Our earlier discussion with respect to the diploma requirement within the Production

Department is pertinent here, as well as our discussion below showing the inadequacies of Scott's attempt to validate the Scott Battery. Scott has made no attempt to validate the high school requirement, and the requirement fails for that reason.

B. Scott Battery

1. Disparate Racial Impact.

In 1958 Scott began using the Kopas Aptitude Test to screen transfers to helper jobs (beginning jobs in the Maintenance Department). Rigid cutoff scores were not employed, however. When, in 1963, blacks were formally admitted to the Maintenance Department, the Kopas Test was still employed; at this time, however, rigid cutoff scores were used. On July 1, 1968, the Wonderlic Aptitude Test was substituted for the Kopas Test. Finally, in November 1970 the Scott Battery of three aptitude tests was substituted for the Wonderlic Test.

■ It is virtually undenied that the Kopas and Wonderlic Tests had a discriminatory impact upon blacks. Although the Wonderlic Test was recommended to Scott by the OFCC, this test has been shown to be discriminatory in impact in a number of other Title VII cases. See, e. g., *Griggs, supra.* As the EEOC, amicus curiae, summarizes the situation

as of December of 1972, there were only six blacks among the ranks of the more than 450 hourly maintenance craft employees. Only three of the blacks had managed to transfer to maintenance jobs between the time the Company ostensibly opened formerly all-white jobs to blacks in March of 1963 and the effective date of the Memorandum.

We have recognized that a statistical showing of black exclusion from a particular kind of job establishes a prima

---

**35.** *See* 6 FEPC at 532.

**36.** *See also* 1970 Census Reports, Detailed Characteristics Alabama (PC(1)–D2), Table 148, at 2–498, which indicates that approximately 33% of white males in the 30–40 age range, compared to only 22% of black males, have completed high school.

facie case of discrimination. See *Rowe v. General Motors Corp.*, 5 Cir. 1972, 457 F.2d 348; *Bing v. Roadway Express,* 5 Cir. 1971, 444 F.2d 687, 689.[37]

 The data with respect to the Scott Battery, however, are less complete. At the time of the trial, only seven blacks had attempted to pass the exam; two passed, although one of those had to take the Battery three times in order to do so. Sixty-one white applicants took the Battery and 24 passed all three tests. The white passing rate was therefore 39.3 percent. For blacks, the rate was 28.6 [38] percent. The court found that this difference was too insignificant to show a discriminatory impact in the absence of evidence of actual cultural bias in the tests. Moreover, as the trial court found, the sample was too small to render the comparative percentages meaningful. Equity requires that we remand for further evidence. The Scott Battery has, presumably, been used in the years since trial. There will be, therefore, a more adequate basis for determining whether the Scott Battery has a discriminatory impact. If the court on remand decides that there is no discriminatory impact, Scott need not perform the additional validation studies that the next section of this opinion would otherwise require.

### 2. Job-relatedness of Scott Battery

Any analysis of the validity of an employment standard that operates to disqualify significantly more of one race than of another must begin with reference to *Griggs*. There, the Supreme Court held that a high school requirement and a general intelligence test requirement were prohibited by Title VII in view of the fact that there was no evidence that showed these criteria were

related to the ability to perform in a specific job. As the Court said, 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 164,

> The Act proscribes not only overt discrimination but practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

Although the principle was easy to state, its application to actual employment situations was fraught with difficulty. The *Griggs* decision cast little light on the methods by which an employment criterion was to be judged with respect to job-relatedness. Until the decision last Term in *Moody v. Albemarle Paper Co., supra,* the lower federal courts were left to their own sources of illumination.

In *Moody,* the Supreme Court affirmed a Fourth Circuit decision holding that, despite a district court's approval of a validation attempt of two written employment tests, the tests had not been properly validated. The most significant aspect of *Moody* is that it relied heavily on the EEOC Guidelines on Employment Selection Procedures, 29 C.F.R. Part 1607, in holding that the validation attempt was inadequate. The Court realized that the Guidelines are not "administrative 'regulations' promulgated pursuant to formal procedures established by the Congress". 422 U.S. at 431, 95 S.Ct. at 2378, 45 L.Ed.2d at 304. Nevertheless, the Court reaffirmed its observation in *Griggs* that the Guidelines are "entitled to great deference", and found that *"[m]easured against the Guidelines, Albemarles' validation study is materially defective in several respects".* *Id.* (emphasis added). Although the authority of the Guidelines as we understood it

---

**37.** Since the Kopas and Wonderlic Tests were not validated by Scott, their use violated the Title VII rights of blacks who failed to gain promotion because of their failure on such tests. *See* 6 FEPC at 549 (Conclusion of Law 14(d)). The district court is directed to provide appropriate relief.

**38.** These computations are based on a comparison of the number of people who took the

exam and the number who passed. If, instead, the computation is based on a comparison of the number of times the exam was taken and the number of times it was passed, the corresponding figures would be 36.3% and 22.2%. (Four whites took the exam twice before passing. One white took the exam twice and failed twice. *See* Pl.Exh. 8.).

in *Georgia Power* may be less compelling than *Moody* now suggests,[39] even in *Georgia Power* we held that the Guidelines "should be followed absent a showing that some cogent reason exists for noncompliance". 474 F.2d at 913. The task before us now is the measurement against the Guidelines, of Scott Battery validation study and the determination, when disparities appear, whether there were "cogent" reasons for noncompliance.[40]

(a). *Were Dr. Scott's Job Analyses Adequate?*

The Guidelines provide that [t]he work behaviors or other criteria of employee adequacy which the test is intended to predict or identify must be fully described; and, additionally, in the case of rating techniques, the appraisal form(s) and instructions to the rater(s) must be included as part of the validation evidence. . . .

29 C.F.R. § 1607.5(b)(3). The plaintiffs criticize Dr. Scott's study for its failure to utilize written job analyses. Scott Paper Company does not deny that Dr. Scott tested only three maintenance crafts at the Mobile mill, whereas the tests are being used to screen applicants to all maintenance crafts. Nor is it denied that only if the particular job skills used in, say, the tested finishing maintenance mechanics craft are not significantly different from the skills required of the untested other crafts, see 29 C.F.R. § 1607.4(c)(2), can a validation of the former suffice as a validation of the latter. The appellants argue that the failure to produce written job analyses deprives the trial court of an adequate basis for accepting Dr. Scott's conclusion that the jobs were "significantly" related.

The district court offered three reasons why Dr. Scott was being given "especially high marks with regard to this threshold step of analyzing the jobs . . . .". 6 FEPC at 536. First, the district court placed reliance upon the fact that Dr. Scott was very familiar with paper mill operations and that he had spent about a week in Scott's Ches-

**39.** See the discussion of *Georgia Power* in Wilson, *A Second Look at Griggs v. Duke Power Company: Ruminations on Job Testing, Discrimination, and the Role of the Federal Courts,* 58 Va.L.Rev. 844, 865–67 (1972), and note 45 *infra.*

**40.** Although unnecessary to our decision, we feel it prudent, in view of the possibility that the question will ultimately have to be resolved in this litigation, to comment about the level of significance that complies with the EEOC Guidelines. The Guidelines provide that

the relationship between the test and at least one relevant criterion [of job performance] must be statistically significant. This ordinarily means that the relationship should be sufficiently high as to have a probability of no more than 1 to 20 to have occurred by chance. . . .

29 CFR § 1607.5(c)(1). This one in twenty requirement is occasionally expressed as significance at the .05 level. Dr. Scott's summary of his test validation inquiry revealed that only one of the tests in the Scott Battery, the Perceptual Speed Test, was significantly valid at this level. The validity of the Purdue Non-Language Test and the Bennett Mechanical Comprehension Test were said by Dr. Scott to "approach" significance at this level. At the trial, Dr. Scott testified that "approaching" significance meant correlations in the range of .06 to .10, i. e. that correlations between test results and rating results could have occurred by chance in 6 to 10 out of 100 studies. The trial court found, upon Dr. Scott's testimony, that tests "approaching significance" would be professionally acceptable. The appellants challenged this finding as being in conflict with the Guidelines.

In *Georgia Power,* 474 F.2d 915, we discussed this Guideline in the context of a study which showed that for six jobs "it was approximately as likely that the [test] results were arrived at purely by chance as that they were more scientifically validated". That is, the significance level for some jobs in *Georgia Power* was about .5. Assuming Dr. Scott's testimony is to the effect that the studied tests "approached" significance at the .1 level, the tests challenged here are at least five times more likely to be valid than the tests that were rejected in *Georgia Power.* Furthermore, we observed in *Georgia Power* that

[w]ere the only criticism of the validation procedures the fact that there was a significance factor of 1 out of 15 or even 1 out of 10 instead of 1 out of 20, the employer might have better standing to complain that the Guideline is arbitrary.

Our observation that a .1 significance level *might* be acceptable is still valid.

ter, Pennsylvania mill closely observing the work of the employees. Second, the district court found that the plaintiffs had failed to show that the technique suggested by its expert, Dr. Ash, was superior to Dr. Scott's technique. Dr. Ash essentially suggested a technique involving long questionnaires to supervisors and a computer job analysis of the answers. The court found that at least Dr. Scott's technique gave him an opportunity to "apply his own judgment or the results of his own observations". 6 FEPC at 536. Third, the fact that Dr. Scott ended up discarding two of the tests that he tried to validate showed that "he was not at all afraid to abandon a test he had initially selected if the evidence did not justify using it". *Id.*

Our primary guidance on this issue is the *Moody* opinion. There, the validation study "involved no analysis of the attributes of, or the particular skills needed in, the studied job groups". 422 U.S. at 432, 95 S.Ct. at 2378, 45 L.Ed.2d at 305. There was no basis, therefore, for concluding that the requirements of 29 C.F.R. § 1607.4(c)(2) had been met. Here, at least, there is something more than "no analysis". Dr. Scott testified that he had spent some time in Scott's paper mill and that he "did analyze the jobs in the sense that I would see people responding in the various jobs". Although there is no testimony about what particular skills were found significant in particular jobs, the district court could reasonably have concluded that particular skills were considered.

A fair reading of *Moody,* however, suggests that analysis, by itself, does not automatically satisfy Title VII requirements. In *Moody,* the tests were given to ten different job groups and separately studied for validity in each group. The study showed that a test that was valid for one job grouping would not necessarily be valid for another, closely

related, grouping. For example, the Wonderlic (Form B) Test was found significant for a group consisting of third, fourth, and fifth hands on the paper machine, although not valid for the higher positions on the paper machine. See 422 U.S. at 437, 95 S.Ct. at 2381, 45 L.Ed.2d at 308 (chart A). Similarly, the Beta Exam was valid for a group of employees high in the wood-yard line of progression, but was not valid for a group of employees immediately below it in the same line of progression. See *id.* As the Court said, the study's "checkered results" compelled the conclusion that there were significant differences between the various jobs.

 Here, although there was more analysis than in *Moody,* it is impossible to undertake the same critical appraisal of Dr. Scott's study as the Supreme Court took of the study involved in *Moody.* The data upon which Dr. Scott's validation study was conducted are not available, having been either lost or destroyed.[41] In light of the somewhat surprising results of the study conducted in *Moody,* it seems unwise to indulge a presumption, admittedly founded upon expert testimony, that all maintenance crafts require the same job skills and that a test significant or valid for one craft is valid for another. The requirements of the Guidelines that there be "careful job analyses", 29 C.F.R. § 1607.-5(b)(3), and that the "[e]vidence of a test's validity should consist of empirical data" 29 C.F.R. § 1607.4(c), are intended to avoid problems such as occurred in the *Moody* study and, for all we know from the record here, plagued Dr. Scott's study as well.

(b). *Were Dr. Scott's Instructions to Supervisor Raters Adequate?*

The second serious problem in Dr. Scott's study is the method by which the supervisors graded or ranked the em-

---

**41.** This observation is not meant as criticism of Scott Paper Company or Dr. Scott. The Guidelines provide that there must be "proper safeguards to protect the security of test scores and to insure that scores do not enter into any judgments of employee adequacy that are to be used as criterion measures". 29 CFR § 1607.5(b)(2). It is conceivable that some data were destroyed in an effort to guarantee compliance with this requirement. *See also* 6 FEPC at 533–34.

ployees who participated in the validation program. This supervisor rating method was explained by Dr. Scott as follows:

A Paired Comparison Technique is a rating technique in which . . . let's say 30 members in the validation sample are each paired with every other member and the rater is presented with a paired comparison deck. And on each of those cards in that deck, there are two men or two women, or two individuals as the case may be, and *his job is to look at those two and to check the one whose job performance seems to be the better of the two.* And then, he goes to the second pair, and so on, until . . . he encounters pairs in which every individual in the sample has been compared with every other individual in that sample.

And then, these frequencies of choices are tallied . . . such that . . . *the person who the rater checks rather consistently as being the better performer when compared with all the other individuals, gets the highest rating score,* and one who rather consistently does not get checked when he is paired with other individuals, gets the lowest rating.

(Emphasis added.) Although there was a mimeographed instruction form for each rater, that form was not introduced into evidence; moreover, it does not appear that the forms required the supervisors to judge specific skills or work functions. Nowhere in the record is there any suggestion that the supervisors were asked to determine something other than which of two employees was "better".

Just such a supervisor rating technique was rejected in *Moody.* The Court observed

[t]he study compared test scores with subjective supervisorial rankings. While they allow the use of supervisorial rankings in test validation, the Guidelines quite plainly contemplate that the rankings will be elicited with far more care than was demonstrated here. Albemarle's supervisors were asked to rank employees by a "stan-

dard" that was extremely vague and fatally open to divergent interpretations . . . [*T*]*he supervisors were asked, in each grouping, to "determine which . . . [employees]* they felt irrespective of the job that they were actually doing, but in their respective jobs, *did a better job than the person they were rating against. . . . "* (emphasis added) There is no way of knowing precisely what criteria of job performance the supervisors were considering, whether each of the supervisors was considering the same criteria—or whether, indeed, any of the supervisors actually applied a focused and stable body of criteria of any kind. There is, in short, simply no way to determine whether the criteria *actually* considered were sufficiently related to the Company's legitimate interest in job-specific ability to justify a testing system with a racially discriminatory impact.

422 U.S. 432–33, 95 S.Ct. at 2379, 45 L.Ed.2d at 305.

As in *Moody,* there is no way of knowing here whether "any of the supervisors actually applied a focused and stable body of criteria of any kind".

The *Moody* Court quoted the EEOC Guidelines with respect to supervisor rating systems:

In view of the possibility of bias inherent in subjective evaluations, supervisory rating techniques should be carefully developed . . . [t]he general point is that all criteria need to be examined to insure freedom from factors which would unfairly depress the scores of minority groups.

*Id.* at 432–33 n. 30, 95 S.Ct. at 2379, 45 L.Ed.2d at 305, *quoting* 29 C.F.R. § 1607.5(b)(4). The Court of Appeals in *Moody* observed that "[s]upervisory ratings . . . which are possibly the single most common performance measure used in validity studies, are subject to personal prejudice. When test scores are correlated with such ratings, the validation, if it can be called that, is of questionable value and may simply prove that the test has the same bias as the

supervisors". 474 F.2d at 139, *quoting* Cooper & Sobol, *Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion,* 82 Harv.L.Rev. 1598, 1662 (1969). We agree with these statements and hold that the absence of evidence of the criteria actually employed by the rating supervisors is a fatal flaw in Dr. Scott's validation study.

### (c). *Concluding Observations*

We realize, first, that neither the Court of Appeals nor the Supreme Court had rendered its decision in *Moody* at the time of Dr. Scott's validation study. Moreover, it is not clear whether the Guidelines upon which we rely were available at the time of this study. Scott contends that this circumstance is a "cogent" reason for failure to comply with the Guidelines. We have some sympathy for Scott's position, but feel that it reflects a misunderstanding of an employer's responsibilities under Title VII. The employer's task under Title VII is to show the job-relatedness of discriminatory testing barriers. Cf. *Pettway,* 494 F.2d at 221 n. 21.

Second, in view of our conclusion that the validation study was inadequate, on the grounds enumerated above, we do not rule on the other objections raised by the appellants—that a differential validation study was feasible, that Dr. Scott's study was inadequately reported, and that Dr. Scott's computational methods were professionally unacceptable. If the Scott Battery is found to have a discriminatory impact and Scott still desires to use it, another validation attempt must be made. In considering whether that study, should it take place, is in compliance with Title VII, we suggest that the district court and Scott comply, as far as possible, with the requirements of the EEOC Guidelines.

Finally, we do not expect our holding here to put a heavy practical burden on Scott. Even at the time of trial, Scott was continuing its validation studies. The evidence from which a new study of validity could be conducted may already have been generated. And as the *Moody* Court noted, "the Guidelines authorize provisional use of tests, pending new validation efforts, in certain very limited circumstances. 29 C.F.R. § 1607.9". 422 U.S. at 436, 95 S.Ct. at 2380, 45 L.Ed.2d at 307. If the district court determines on remand that the Scott Battery has a disproportionate racial impact, it is within the court's power to consider whether Scott may, consistently with the Guidelines, continue to employ the Scott Battery while conducting a new validation study.

## VI. SUPERVISORY EMPLOYEES

The appellants contend that the district court erred in finding that Scott did not discriminate in the selection of hourly employees for promotion to supervisory[42] jobs. The evidence established that blacks received only seven of the 81 promotions to salaried supervisory positions since July 2, 1965. As of trial, there were 186 white supervisors who had been promoted from the hourly ranks, as opposed to 13 blacks. Translated into percentages, about 8.6 percent of all promotions in the eight years before trial went to blacks, and about 6.5 percent of all promoted supervisors at the time of trial were black. This may be compared with the percentage of black production employees (semi-skilled operatives and unskilled laborers): in 1972,

---

**42.** Scott employs supervisors in both the Production and Maintenance Departments. The appellants' argument does not distinguish between the two situations. It is undisputed, however, that most of Scott's Maintenance supervisors are hired from without the company, and that most are required to have college degrees in engineering. Pre-trial Stipulation 39. The appellants have not argued that this degree requirement is discriminatory in any manner. Also, the incredibly small number of blacks in the Maintenance Department renders infeasible a statistical approach to the question whether there is a prima facie case of discrimination. Insofar as the district court may have found that supervisor selection in the Maintenance Department is nondiscriminatory, the court was not erroneous. Our attention, therefore, is focused only on supervisor selection procedures in the Production Department.

there were 1535 whites and 658 blacks, for a black representation of about 30 percent. This percentage has been growing steadily since 1966, when it was 18.3 percent. It appears, therefore, that blacks received less than half the number of promotions to salaried positions they should have received had they been promoted at the same rate as white hourly employees.[43]

We note first that the district court found that the "low turnover rate among the supervisory positions" was the "most realistic reason" why "there are not as many black supervisors as Scott would like to have". 6 FEPC at 546. This may be true, but its bearing on the case is minimal. As the statistics show, there has been no shortage of vacancies in supervisory slots. The appellants complain, not about the absolute number of blacks in supervisory positions, but about the fact that whites seem to be preferred to blacks when promotions are made.

Most of the observations of the district court are pertinent, however. The court found that "[s]election of first line supervisors is done by the top management officials at Scott on the basis of the most objective criteria possible". Along with such factors as "attendance records, productivity records, and the number of reprimands received", the court found other criteria, "such as leadership and intelligence", to be "objective criteria as these qualities are easily recognizable in employees whose work has been observed for a number of years". Similarly, the court held that an employee's performance in "temporary set-ups" is an "objective means of determining whether the employee is qualified to be a permanent first line supervisor". *Id.* at 541–42.

In addition, the district court found no evidence that the predominantly white first line supervisors had the authority to decide whom to promote. Another explanation for the disproportionately low number of blacks in supervisory ranks was that a "majority of first level production supervisor vacancies are filled from the upper ranks of incumbent hourly paid employees", and that "there were comparatively few blacks who had risen sufficiently high in enough lines of progression to gain the experience and technical knowledge required of a supervisor". Finally, the court noted that an employee interested in becoming a supervisor had to exercise a "certain degree of initiative" in making his interest known, but that "such initiative is in itself one test of whether the employee has the potential to be a supervisor". *Id.* In its Conclusions of Law, the court held that Scott's conduct conformed to the standards we established in *Rowe v. General Motors Corp.*, 5 Cir. 1972, 457 F.2d 348. 6 FEPC at 549. The trial court's reference to *Rowe* correctly draws our attention to the Fifth Circuit case most on point.

### A. Prima Facie Case of Discrimination

In *Rowe*, we encountered statistics very similar to those in this case. We observed that

> [o]ut of a total of 114 employees promoted from hourly jobs to salaried jobs between 1963 and 1967, only 7 were Blacks. Between 1967 and 1969, although 330 employees were promoted/transferred from hourly to salaried jobs, only 20 Blacks were promoted/transferred. Early in 1969, 35 hourly workers were promoted, 8 of this number were Blacks.

*Id.* at 357. The percentage of blacks in the general working population of the employer varied from 9.8 percent (De-

---

43. The only numerical figures referred to by the district court are those showing that, at the time of trial, there were 9 black, first line supervisors. *See* 6 FEPC at 541, *citing* Plaintiff's Exhibit 13. There seems to be some contradiction between Plaintiff's Exhibit 13 and Plaintiff's Exhibit 22, which we rely on in our analysis. Exhibit 22 was referred to by the appellants in their main brief at p. 82, however, and Scott did argue with the figures they cited. *See* Scott Br. at 45–46. Since our interpretation of Exhibit 22 is more favorable to Scott than the appellants', we believe, as we did in *Rowe*, 457 F.2d at 357 n. 16, that "possible errors are of little consequence".

cember, 1966) to 14.1 percent (January, 1969), see *id.* n. 18; the percentage of blacks promoted to salaried jobs was 6.6 percent between 1963 and 1967, and 6.1 percent between 1967 and 1969.

On this basis, we reversed the trial court's determination that blacks had not been subject to discrimination. We said that

> figures of this kind, while not necessarily satisfying the whole case, have critical, if not decisive, significance—certainly, at least in putting on the employer the operational burden of demonstrating why, on acceptable reasons, the apparent disparity is not the real one.

*Id.* at 358. See also *Hayes International Corp.*, 456 F.2d at 120 (comparing percentages of blacks hired into clerical and technical positions with percentage of blacks in community). In *Hayes*, we observed that

> lopsided ratios are not conclusive proof of past or present discriminatory hiring practices; however, they do present a *prima facie* case. The onus of going forward with the evidence and the burden of persuasion is thus on Hayes.

*Id.*

▆▆ The only reasonable interpretation of the statistics from Scott's Mobile plant is that whites have been preferred over blacks in promotions to salaried positions. As in *Rowe* and *Hayes*, at this point it is the employer who bears the

burden of persuasion that there are non-discriminatory reasons for the observed disparity.[44]

**B. The Employee's Justifications**

The two main factors offered by the district court as justifications for the low number of blacks in supervisory positions were (1) the absence of blacks who had acquired sufficient experience in various lines of progression and (2) the objectivity and fairness of the supervisor selection system.

In *Rowe*, we rejected the employer's argument that the absence of blacks from salaried positions was due to the fact that " 'experience' was essential and only long-employed Whites—and conversely, not the recently hired Blacks—had the 'experience' ". 457 F.2d at 358. There, that few blacks had "experience" was partially because the employer's seniority system perpetuated the effects of past discrimination and, as a result, blacks were primarily laid off during declines in manufacturing output. We agree that "*qualifications* are an employer's prerogative", but we also declared that the "incantation of 'experience' needs" could not be "automatically applied". *Id.* See also *Rodriguez*, 505 F.2d at 59.

▆▆ The situation here is analogous to that in *Rowe*. Past discriminatory practices have either prevented or discouraged many of Scott's employees from transferring to many lines of progression and from gaining the experience Scott deems necessary in a supervisor. Our recent observation in *Steven-*

---

44. *See also Pettway v. American Cast Iron Pipe Co.*, 5 Cir. 1974, 494 F.2d 211, 225 & n. 34; *Johnson v. Goodyear Tire & Rubber Co.*, 5 Cir. 1974, 491 F.2d 1364, 1371–73; *United States v. Jacksonville Terminal Co.*, 5 Cir. 1971, 451 F.2d 418, 424–36, 441–42; *Brown v. Gaston County Dyeing Mach. Co.*, 4 Cir. 1972, 457 F.2d 1377, 1382, *cert. denied*, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246; *Carter v. Gallagher*, 8 Cir. 1971, 452 F.2d 315, *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338; *United States v. Ironworkers Local 86*, 9 Cir. 1971, 443 F.2d 544, 550, *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367; *Jones v. Lee Way Motor Freight, Inc.*, 10 Cir. 1970, 431 F.2d 245, 247. As we said in *Pettway, see* 494 F.2d at 225 n. 34,

> The courts have based a finding of adverse impact on data showing the percentages of blacks and whites hired as compared to the percentages of each in the available population. The statistical disparity is held to create a *prima facie* showing of discriminatory impact and thus invokes a requirement that the job relatedness of the overall selection process be established.

> We note that the district court's opinion does not suggest that the burden of persuasion had been shifted to the employer. Indeed, the district court failed to make any statistical findings such as we use in text. Similar failures were suggested in *Rowe* to be "[i]ndicative, perhaps, of the Trial Judge's approach to the suit". 457 F.2d at 357 n. 16.

son v. *International Paper Co.*, 5 Cir. 1975, 516 F.2d 103, 117 is directly on point:

> To the extent that the plaintiffs are ineligible for supervisory positions because they are not high enough in the lines of progression from which they were previously barred by discrimination, they are disadvantaged because of their employer's prior illegal practices.
>
> Under such circumstances, [the employer] . . . must demonstrate that the requirement of being high in a line of progression is compelled by business necessity. If it cannot be so justified, it cannot be used to foreclose a class member's consideration for a supervisory position.

There was no finding in this case that an employee's being high in a line of progression, before promotion to a supervisor's job, was a business necessity. Most supervisors in the Maintenance Department, for example, are hired from outside the company rather than promoted from within. Even in the Production Department there has been at least one supervisor appointed who had no experience in the area placed under his control. Certainly, it would not seem like good business practice if Scott were to acquire all of its supervisors from among those employees who had no first hand knowledge of a particular line of progression. But it is equally unlikely (indeed, no one contends this is the case) that all supervisory personnel need experience in every job in a line of progression. With respect to prior discriminatees the district court should determine whether minimum residency periods, analogous to job-skipping within lines of progression, are feasible and, if so, establish them.

It is not merely the affected class which complains about Scott's selection of supervisors; it is a class including other black employees of Scott. It is appropriate, with respect to these employees, to scrutinize Scott's selection

procedure. *Stevenson.* We turn again to *Rowe.*

In *Rowe*, there were five aspects of the promotion system that, taken together, rendered it inadequate in view of its discriminatory effect. These were (1) that the foreman's recommendation was the single most important factor to promotion, (2) that foremen were given no written instructions pertaining to qualifications necessary for promotion, (3) that the "standards which were determined to be controlling [were] vague and subjective", (4) that hourly employees were not notified about vacancies or the necessary qualifications, and (5) that there were "no safeguards in the procedure designed to avert discriminatory practices". 457 F.2d at 358–59. Since the system employed by Scott is not significantly different from the system condemned in *Rowe*, we are constrained to hold that Scott's system must be modified.

 First, it appears that low-level supervisors do constitute a crucial part of the promotion process, in that they provide a list of people who in their opinion should be considered for supervisory positions.[45] Second, there is no adequate safeguard against racial bias in the recommendations of low-level supervisors. Although the district court concluded that "middle level . . . officials . . . would be able to counteract . . . bias", the record does not adequately support this conclusion. Third, the first line supervisors did not have any written instructions specifying the qualifications desirable or necessary in a supervisor. Fourth, some of Scott's criteria for promotion can be described only as "subjective". Fifth, it is not clear from the record whether hourly employees were informed about vacancies in supervisory slots. The supervisor selection system here is indistinguishable from the system found faulty in *Rowe*. We do not question Scott's good faith in utilizing this system. A federal court

---

45. The vesting of such authority in first line supervisors has been censured in other cases. *See, e. g., Baxter v. Savannah Sugar Ref.* *Corp.*, 5 Cir. 1974, 495 F.2d 437, 442; *United States v. N. L. Indus., Inc.*, 8 Cir. 1973, 479 F.2d 354, 367–68.

attempting to enforce Title VII and protect the rights of minority employees must strive, however, to cut beneath the facade of good faith, counteract the "built-in headwinds" of racial bias, and prevent discriminatory *consequences*. *Griggs v. Duke Power Co.*, 401 U.S. at 432, 91 S.Ct. at 854, 28 L.Ed.2d at 164.

The district court is instructed to reexamine Scott's selection procedures and order appropriate injunctive relief. Such relief may include, but need not be limited to, (1) formulating guidelines that explain the manner in which job-related objective criteria, such as absenteeism and number of reprimands, are evaluated, (2) formulating guidelines that explain the relative importance of subjective criteria found to be job-related, (3) formulating guidelines with respect to the experience generally necessary in each line of progression (and, with respect to the affected class, minimum residency periods, if possible), (4) requiring posting of supervisor vacancies and formal bidding, (5) devising a procedure by which Scott can recognize situations where first line supervisors' recommendations might be affected by racial bias, (6) setting affirmative action goals, consistent with Scott's business needs, that will help to reduce the psychological barriers resulting from Scott's past discrimination.[46]

## VII. BACK PAY

### A. Propriety of Back Pay Award

 The district court, after observing that "Scott did not actually intend to discriminate, and [that] the necessary discriminatory intent cannot be inferred from the fact that Scott continued its same course of conduct after having had a chance to observe its effects", held that the plaintiffs were not entitled "to any back pay award". 6 FEPC at 549. Even if discrimination in fact were proved, however, the court held that it would not exercise its "discretionary" power to grant pay where, as in the instant case, discrimination

arose only as an accidental and limited by-product of Scott's good faith and highly successful efforts to remove the remaining effects of past discrimination.

*Id.* at 550. Scott, in support of these "sound proposition[s] of law", points to the "numerous opportunities for almost all black employees who were long ago . . . the victims of discrimination . . . .". The defendant unions argue, in support of the district court's result, that the OFCC's approval of the Memorandum of Understanding is a "special circumstance" in which a denial of back pay is permissible. Because the law in this Circuit and in the Supreme Court fundamentally conflicts with the denial of back pay in this case, we reverse this part of the lower court decision and remand for further proceedings.

The Supreme Court, in *Moody*, reviewed a district court denial of back pay on grounds that (1) there was no evidence of bad faith non-compliance with Title VII, and (2) the defendants would be substantially prejudiced by an award of back pay that was demanded contrary to an earlier representation. The Court recognized that the power to award back pay is, indeed, discretionary. Nevertheless, such discretion was not to be "left to a court's 'inclination, but to its judgment; and its judgment is to be guided by sound legal principles' ". *Id.*, 422 U.S. at 416, 95 S.Ct. at 2371, 45 L.Ed.2d at 296, *quoting United States v. Burr*, C.C.Va.1807, 25 Fed.Cases pp. 30, 35, No. 14,692d (Marshall, C. J.). The legal principles that guide Title VII back pay judgments were held to be the purposes of the Act to "achieve equality of employment opportunities" and to "make persons whole for injuries suffered on account of unlawful employment discrimination". 422 U.S. at 417, 418, 95 S.Ct. at 2372, 45 L.Ed.2d at 297. Back pay had an obvious connection with both of these guiding principles.

Most importantly, the Supreme Court held that the lack of bad faith was "not

---

**46.** *See United States v. N. L. Indus., Inc.*, 8 Cir. 1973, 479 F.2d 354, 369; Blumrosen, *The Duty of Fair Recruitment Under the Civil* *Rights Act of 1964*, 22 Rutgers L.Rev. 465, 479 (1968); *cf. United States v. Sheet Metal Workers Local 36*, 8 Cir. 1969, 416 F.2d 123, 132.

a sufficient reason for denying" back pay. *Id.* at 422, 95 S.Ct. at 2374, 45 L.Ed.2d at 299. The lack of bad faith merely "open[ed] the door to equity; it [did] not depress the scales in the employer's favor". The opposite conclusion would have undermined the "make whole" purpose of Title VII, a result inconsistent with the fact that "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation". *Id., quoting Griggs v. Duke Power Company,* 1971, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158, 164.

Here, Scott contends that the denial of back pay was not, in fact, based on Scott's good faith. The district court's opinion belies that contention, however. The denial was based, first, upon an erroneous view of Title VII law, a view that confused Scott's good faith efforts to comply with actual compliance. Second, the district court's observation that any discrimination was "accidental" again turns on a finding that Scott's motives were blameless, that Scott did not act in bad faith. But *Moody* scuttles the proposition that an employer's blameless motives protect it from back pay liability. See also *Mims v. Wilson,* 5 Cir. 1975, 514 F.2d 106, 109–10.

The Supreme Court's observation in *Moody* that the second reason proffered by the district court for back pay denial—that the employer would be unfairly prejudiced if back pay were granted—might, in the absence of the first reason, still be sufficient, lends support to the unions' argument. This Court has ordered back pay, however, where the OFCC had first approved various employment systems. See *Pettway,* 494 F.2d at 219, 251; *Johnson,* 491 F.2d at 1375–77, *rev'g on other grounds* S.D.Tex. 1972, 349 F.Supp. 3, 8, 16. We again hold that the OFCC's intervention does not constitute a sufficiently compelling reason to deny discriminatees the relief made possible by Title VII. Indeed, it is likely that, in the absence of the OFCC's intervention in 1968, the defendants here would have been subject to even greater back pay liability than otherwise.

We note that in *Stevenson,* 516 F.2d at 117, we recently remanded to the district court the general question of back pay in light of *Moody* and recent Fifth Circuit cases. It is more appropriate here, however, than in *Stevenson* to hold that back pay is necessary. In *Stevenson,* there was no sufficient showing of discrimination because the court erroneously limited the proof. Here, however, the record adequately demonstrates numerous violations of Title VII.

B. Statute of Limitations

Although the district court did not believe that back pay was appropriate, its holding that "[t]he statute of limitation applicable to this action is one year" is now important to this case. See 6 FEPC at 545, *citing United States v. Georgia Power Co.,* 5 Cir. 1973, 474 F.2d 906, *and* Code of Ala., tit. 7, § 26 (1958). The appellants did not object to his holding in their briefs on appeal, but at the request of the Court during oral argument, the parties filed post-argument briefs on this issue. The district court's holding here was correct.

In *Georgia Power* we held that a Georgia statute, providing a two year limitation period for actions brought for recovery of wages, Ga.Code § 3–704, applied to a back pay claim under Title VII. We observed that

Title VII and similar statutes created new causes of action which did not exist at common law or under state statutes. In respect to those causes of action which have no close analogies in state law, civil rights statutes have generally been held governed by the limitation on liabilities created by statute. . . . However, where federal laws create rights to back pay as part of general remedial relief, courts have generally applied the appropriate state statute of limitations governing actions for unpaid wages. . . .

474 F.2d at 924. Here, the Alabama statute of limitations for statutory wage actions, Code of Ala., tit. 7, § 26(1) (1958), has been held unconstitutional with respect to back pay actions under the Fair Labor Standards Act. See *Caldwell v. Alabama Dry Dock & Ship-*

*building Co.*, 5 Cir. 1947, 161 F.2d 83, 86. *Caldwell* held § 26(1) unconstitutional because it created a one year limitation period for federal causes of action but did not affect the three and six year limitation periods applicable to "contract[s] of employment", implied or written, respectively. *Id.* at 85. The appellants argue that *Caldwell* requires us to apply either a three or six year period of limitation. This argument must be rejected.

Without citing either *Caldwell* or Alabama cases, this Court recently held that Code of Ala., tit. 7, § 26 (1958) provided the applicable limitation period in a Title VII back pay suit. See *EEOC v. Griffin Wheel Co.*, 5 Cir. 1975, 511 F.2d 456, 458 n. 4. Section 26 (a separate statute from § 26(1)) also provides for a one year limitation period, in actions "for a penalty given by statute to the' party aggrieved" and "for any injury to the person . . not arising from contract, and not herein specifically enumerated". The first question, however, is whether *Caldwell's* holding § 26(1) unconstitutional applies to this case. If it does not apply, *Georgia Power* requires us to use the § 26(1) period of limitations. If *Caldwell* continues to apply, however, we must then determine whether § 26 has incorrectly been used to supersede Alabama's three and six year limitation periods.

■■■ The continued validity of *Caldwell* is questionable. Our conclusion there that § 26(1) was unconstitutional was based upon the fact that the statute "discriminate[d] against rights and causes of action arising under a valid federal statute". 161 F.2d at 85. Although the statute nominally applied to "[a]ll suits and actions for the recovery of wages . . . accruing under laws respecting the payment of wages, . . . specifically under the . . . Fair Labor Standards Act . . . and all other similar Acts", we noted that there [were] no wage and hour laws or other "similar Acts" in Alabama. Therefore, the effect of § 26(1) was to discriminate against federal causes of action. It appears, however, that Alabama has enacted a minimum wage law with respect to public contractors. See Code of Ala., tit. 26, §§ 375(8)–(24). Because § 26(1) can no longer be said to discriminate against federal causes of action, the rationale of *Caldwell* has been undermined.[47] Although Title VII is not a "law respecting the payment of wages" in the same sense that the FLSA is, it is sufficiently "similar" in its back pay provision to require application of § 26(1).

If *Caldwell* still applies, however, or if § 26(1) does not reach a Title VII type of action, the district court was correct in holding that § 26 provided a one year limitation period. *Georgia Power* observed that "[t]he right to be free from discriminatory practices in employment is not analogous to the right of action on implied or unwritten contracts . . . Indeed, it is the *failure* to contract for employment or promotion on an equal basis which gives rise to a Title VII action". 474 F.2d at 924; see *Buckner v. Goodyear Tire & Rubber Co.*, 5 Cir. 1973, 476 F.2d 1287, *adopting lower court opinion and aff'g* N.D.Ala.1972, 339 F.Supp. 1108, 1118 (Title VII). *Buckner* relied upon our reasoning in *Sewell v. Grand Lodge of International Association of Machinists*, 5 Cir. 1971, 445 F.2d 545, *cert. denied*, 404 U.S. 1024, 92 S.Ct. 674, 30 L.Ed.2d 674. There we held that § 26 applied to a complaint, under the Labor Management Reporting and Disclosure Act,[48] alleging wrongful discharge, for the exercise of first amendment rights, from a union position. We drew the distinction between rights arising ex con-

---

**47.** This may explain the fact that § 26(1) has been cited twice in Fifth Circuit Title VII cases as the appropriate Alabama statute of limitations. *See Pettway v. American Cast Iron Pipe Co.*, 5 Cir. 1974, 494 F.2d 211, 258; *Johnson v. Goodyear Tire & Rubber Co.*, 5 Cir. 1974, 491 F.2d 1364, 1379 n. 49. These cases did not, however, mention *Caldwell*. In *Buck-*

*ner v. Goodyear Tire & Rubber Co.*, N.D.Ala. 1972, 339 F.Supp. 1108, 1117, *aff'd*, 5 Cir. 1973, 476 F.2d 1287, the district court recognized that § 26(1) had been declared unconstitutional without mentioning the public contractor/minimum wage law.

**48.** 29 U.S.C. §§ 401 *et seq.*

tractu and rights arising ex delicto and held that, since there was no contract alleged as the basis of the plaintiff's rights, the ex delicto statute of limitations, § 26, barred the action. *Id.* at 549–50. See also *Brotherhood of Locomotive Firemen v. Mitchell,* 5 Cir. 1951, 190 F.2d 308, 313 & n. 7, which applies § 26 to an employee's suit against a union for violation of the duty of fair representation. These cases supply ample support for *Griffin's* holding that § 26 is applicable to Title VII.

 Finally, we need to determine whether *Caldwell's* observation that Alabama uses its three and six year limitation periods in claims arising under "contracts of employment" is apposite. The Alabama law, with respect to the distinction between rights ex contractu and rights ex delicto, was correctly stated in *Sewell.* See, e. g., *Chambers v. Birmingham Trust & Savings Co.,* 1936, 232 Ala. 609, 168 So. 893; *Adler v. Miller,* 1928, 218 Ala. 674, 675, 120 So. 153, 154; *Blythe v. Enslen,* 1919, 203 Ala. 692, 85 So. 1, 2. *Sewell* is not inconsistent with *Caldwell.* Where a statute sets the amount of compensation due an employee, the statute may be read into the employment contract, and a suit for back wages is based upon contract. See *State ex rel. Hyland v. Baumhauer,* 1942, 244 Ala. 1, 12 So.2d 326, 331.[49] This would be the case under the Fair Labor Standards Act, the statute dealt with in *Caldwell.* Title VII provides for back pay, but does not prescribe what that pay shall be. Therefore, Title VII is not to be understood as "implied" in the plaintiffs' employment contracts. The employees' right to back pay arises out of the duty not to discriminate imposed by Title VII, not out of a contract.[50]

## VIII. WILL ROBINSON

 Will Robinson was temporarily discharged from his job for a series of mistakes and refused to return to work on Scott's terms. The district court found that Robinson failed to prove that his treatment "was . . . motivated by racial discrimination against him". 6 FEPC at 544. Robinson urges on appeal that he is entitled to a remand in light of *McDonnell-Douglas Corp. v. Green,* 1973, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668.[51] Specifically, Robinson argues that reconsideration is necessary in view of the Supreme Court's dictum that an employer's historical attitude to minority employment might be relevant to determining whether the employer's articulated reason for its behavior was merely a pretext to hide that behavior's actual discriminatory basis. *Id.* at 804–05, 93 S.Ct. at 1825–26, 36 L.Ed.2d at 678–79. We affirm this part of the lower court's judgment, for we find no reason to believe that the judgment would be different after *Green.* The history of the Scott paper mill was before the trial court when it decided Robinson's case. As in *Peters v. Jefferson*

---

**49.** *See also City of Anniston v. Dempsey,* 1950, 253 Ala. 597, 45 So.2d 773, 776; *Kirkland v. Jefferson County,* 1943, 244 Ala. 69, 12 So.2d 347. These are similarly distinguishable from a Title VII cause of action, as the plaintiffs sought to recover back pay based upon a definite salary for which they may fairly be said to have contracted.

**50.** We do not decide whether, as the appellants contend, Section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g) allows back pay for two years preceding the filing of a complaint, regardless of the state statute of limitations, as long as the suit was timely brought. In denying a petition for rehearing or rehearing en banc, the Court in *EEOC v. Griffin Wheel Co.,* 5 Cir. 1975, 511 F.2d 456, responded to an argument similar to that made here by allowing the district court to consider it on remand. In light

of the district court's greater familiarity with Alabama law, we do the same.

**51.** The Supreme Court held there that the plaintiff has the initial burden of establishing a prima facie case of racial discrimination, which may be accomplished by showing that the plaintiff was a member of a minority, that he was qualified for a position, and that a nonminority individual, with equal or lesser qualifications, received a job preferentially. Then, the employer has the burden of articulating "some legitimate, nondiscriminatory reason" for the employee's rejection. Finally, the plaintiff has an opportunity to prove that the employer's articulated reason was merely a pretext for discrimination. *See* 411 U.S. at 802–05, 93 S.Ct. at 1824–26, 36 L.Ed.2d at 677–79.

*Chemical Co.*, 5 Cir. 1975, 516 F.2d 447,[52] our review of the entire record satisfies us that the district court weighed the evidence before it properly. The evidence sufficiently supported the finding that Robinson was discharged legitimately.

## IX. ATTORNEYS' FEES

█ In light of our holding that the plaintiffs substantially proved most of the Title VII violations they alleged,[53] we do not disturb the district court's award of attorneys' fees against the defendants,[54] nor do we discuss whether that award would have been proper had we completely affirmed the substantive decisions of the district court. That portion of the district court's judgment relating to attorneys fees is affirmed.[55]

\* \* \*

In conclusion, the lower court's decision is AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED for proceedings consistent with this opinion.

---

**52.** *See also Wells v. Ramsay, Scarlett & Co.*, 5 Cir. 1975, 506 F.2d 436; *Long v. Sapp*, 5 Cir. 1974, 502 F.2d 34; *Resendis v. Lee Way Motor Freight, Inc.*, 5 Cir. 1974, 505 F.2d 69, 72.

**53.** We recognize, of course, that the individual plaintiff Will Robinson cannot be said to have directly prevailed in this case. Nevertheless, an individual plaintiff may be entitled to reasonable attorneys fees, despite his failure to prove his own claim, when the class he represents is successful. *See Clark v. American Marine Corp.*, E.D.La.1970, 320 F.Supp. 709, 710, *aff'd*, 5 Cir. 1971, 437 F.2d 959; *Parham v. Southwestern Bell Tel. Co.*, 8 Cir. 1970, 433 F.2d 421, 429–30; *Reed v. Arlington Hotel Co.*, 8 Cir. 1973, 476 F.2d 721, 726, *cert. denied*, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103; *United States v. United States Steel Corp.*, N.D.Ala. 1973, 371 F.Supp. 1045, 1063, *partial denial of back pay vacated and case remanded*, 5 Cir.

1975, 520 F.2d 1043; *Fogg v. New England Tel. & Tel. Co.*, D.N.H.1972, 346 F.Supp. 645, 651.

**54.** *See* 42 U.S.C. § 2000e–5(k).

**55.** We note that in *Baxter v. Savannah Sugar Ref. Corp.*, 5 Cir. 1974, 495 F.2d 437, 447, we vacated an award of attorneys fees where the case was to be remanded for further proceedings in the district court. This is not, however, authority for vacating the award in the present case. In *Baxter*, the prevailing party attacked the award as insufficient, and this Court vacated because of an insufficient record. Here, although we also remand, there is no issue concerning the adequacy or inadequacy of the award. There is, therefore, no need to remand for clarification or supplementation as there was in *Baxter*.